Vivian **JOHNSON** and Dorothy Burton, on behalf of themselves and all others similarly situated

v.

**SHREVEPORT GARMENT COMPANY and Delta Garment Corporation.**

Civ. A. No. 74–494.

United States District Court, W. D. Louisiana, Shreveport Division.

Nov. 18, 1976.

Frank E. Brown Jr., Piper & Brown, Shreveport, La., Okla Jones II, Lawyers' Committee for Civil Rights Under Law, New Orleans, La., for plaintiffs.

John E. McFall, Kullman, Lang, Inman & Bee, P.C., New Orleans, La., for defendants.

## OPINION

STAGG, District Judge.

Plaintiffs Vivian Johnson and Dorothy Burton brought this action against Shreveport Garment Manufacturers of Louisiana (Shreveport Garment) and Delta Garment Corporation (Delta Garment) pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.,* and the Civil Rights Act of 1866, 42 U.S.C. §§ 1981, 1983, in behalf of themselves and others similarly situated. Their cause of action rests on allegations of race and sex discrimination. The Court has jurisdiction over the action by virtue of 28 U.S.C. § 1343(3), (4), and 42 U.S.C. § 2000e–5(f)(3). Venue is proper in the Western District of Louisiana, Shreveport Division, because all parties reside in Shreveport, Louisiana.

Shreveport Garment and Delta Garment operate small cut-and-sew plants. They engage in the manufacture of work clothes and fashion jeans. The total employment in the two plants is less than 200 persons. Shreveport Garment operates with four departments: office, cutting, pressing and shipping. The latest figures for the plant show that over half of its employees are black and over half of them are females. Delta Garment operates with three departments: administrative, felled seam, and safety stitch. Well over half of its employees are black females.

The named plaintiffs sought to represent a class composed of (1) all blacks then employed at Shreveport Garment, (2) all blacks who had been discriminated against due to their race or color with respect to compensation or terms and conditions of employment at either facility, (3) all blacks who had been denied promotions at either facility due to their race or color, (4) all blacks who had been maintained in separate facilities due to their race or color, (5) all blacks who applied for work at either facility but were rejected due to their race or color, and (6) all blacks who would have applied for work at either facility but did not because of the reputation for racially or sexually discriminatory conduct. On January 15, 1976, the Court ruled that the action should be permitted to proceed as a class action. Due to possible problems with conflicting interests and manageability, the Court limited the class to (1) black females who sought employment at Shreveport Garment or Delta Garment and who were refused employment because of their sex, race or color and (2) black females who were or had been employed at either facility and were subjected to on-the-job discrimination because of their sex, race or color.

■ The complaint noted a number of allegedly unlawful acts by defendants. It alleged that the two facilities were maintained under separate name for the primary purpose of racial segregation. It alleged that defendants used discriminatory evaluations concerning hiring and promotions. The complaint stated that defendants paid black females less than their male or white counterparts for the same or similar work. Finally, the complaint alleged that defendants discriminated against plaintiffs with respect to working conditions, terms of employment and fringe benefits.

## THE CLASS ACTION

Rule 23(c)(1), Federal Rules of Civil Procedure, states:

"(1) As soon as practicable after the commencement of an action brought as a class action, the court shall determine by order whether it is to be so maintained. An order under this subdivision may be conditional, and may be altered or amended before the decision on the merits."

The trial court has a measure of discretion to determine whether an action properly should progress as a class action. *Jones v. Diamond,* 519 F.2d 1090 (5th Cir. 1975); *Huff v. N. D. Cass Company of Alabama,* 468 F.2d 172 (5th Cir. 1972); *Johnson v. Georgia Highway Express, Inc.,* 417 F.2d 1122 (5th Cir. 1969). When the Court makes a determination of class status at an early stage in the proceeding, it should attempt to uphold class status. 7A Wright & Miller, Federal Practice & Procedure § 1785 at 138 (1972) [hereinafter cited as Wright & Miller]; *cf. Yaffe v. Powers,* 454 F.2d 1362 (1st Cir. 1972). In fact, the court in *Jones v. Diamond, supra,* stated that if an error should be made with regard to class status at an early stage, the court should err in favor of maintenance of a class action. The appellate court may find that the trial court abused its discretion by denying class certification without an evidentiary hearing, especially in civil rights cases. *See Jones v. Diamond, supra,* at 1099; *Huff v. N. D. Cass Company of Alabama, supra,* at 713.

■ A decision as to class certification is not immutable; if later events indicate that the decision should be reversed, Rule 23(c)(1), which allows alteration or amendment of certification prior to a decision on the merits, empowers the Court to act. *Jones v. Diamond,* 519 F.2d 1090 (5th Cir. 1975); *Gerstle v. Continental Airlines, Inc.,*

466 F.2d 1374 (10th Cir. 1972); *Zenith Laboratories, Inc. v. Carter-Wallace, Inc.,* 64 F.R.D. 159 (D.N.J.1974); 7 Wright & Miller § 1765 at 625–26. The decision of the United States Court of Appeals for the Fifth Circuit in *Gonzales v. Cassidy,* 474 F.2d 67 (5th Cir. 1973), mandates that the trial court determine the propriety of class action status at the preliminary certification stage and after trial on the merits. Therefore, although this Court certified this action as a class action on January 15, 1976, it must re-examine Rule 23 and its requirements to determine whether the case should proceed as a class action.

Rule 23(b) specifies three types of cases in which a class action is proper. Subdivision (b)(2) concerns claims against a party that involve conduct affecting the purported class as a whole. At trial, plaintiffs produced weak proof of conduct toward the class as a whole, but the trial presentation does not justify reversing the January 15 ruling on that point. The action meets the requisites of Rule 23(b).

Similarly, in January this Court determined that the class met the requirements of Rule 23(a), numerosity, commonality, typicality and adequacy of representation. No doubt the class, comprised of over 100 persons, still meets the numerosity test. On the points of commonality and typicality the plaintiffs lacked evidence, but the deficiency does not merit reversal of the earlier ruling on those points. A more difficult question arises with respect to the adequacy of the named plaintiffs' representation of the absent class members.

The requirement of adequate representation, the minimum protection that representation must effect, and the subsequent binding effect of the judgment are questions that strike to the very core of the class action device. The representation requirement for maintenance of a class action lies at the heart of the rationale supporting the class action. In its mandate that the trial court consider class status at two stages of the proceeding, the Court of Appeals, in *Gonzales v. Cassidy,* 474 F.2d 67 (5th Cir. 1973), made specific reference to effective representation. The history of the action points to the requirement of Rule 23(a)(4) as the most important aspect of the class status determination.

Prior to the nineteenth century, the English chancery courts developed a method to facilitate the adjudication of disputes concerning common questions and multiple parties in a single action. *See* 7 Wright & Miller § 1751 at 504. Professor Pomeroy explained:

"The earliest instances in which the court of chancery exercised its jurisdiction, avowedly upon the ground of preventing a multiplicity of suits, appear to have been called 'bills of peace', of which there were two distinct kinds. One of these was brought to establish a general right between a single party on the one side, and numerous persons claiming distinct and individual interests on the other . . . ." 1 Pomeroy, A Treatise on Equity Jurisprudence § 246 at 467–68 (5th ed. Symons 1941) [hereinafter cited as Pomeroy].

The equity courts originally used the bill of peace to settle disputes between the lord and his tenants or copyholders over the customs of the manor. The jurisdiction then spread to analogous remedies, including situations in which several persons had claims against the same party and those in which a party claimed a common right against a number of persons. Pomeroy § 247 at 468–69 and § 246 at 467–68. *See generally* 7 Wright & Miller § 1751.

Equity courts took jurisdiction over bills of peace because the multiplicity of the claims and the possibility of inconsistent judgments made any remedy at law inadequate, even if the relief sought was entirely legal. From these principles sprang the equitable maxim, *Equity will relieve the necessity of a multiplicity of suits. See* Pomeroy § 250 at 459. Thus, a class could maintain a bill of peace if it could establish that the number of class members was so large that joinder of all of them was impracticable, that all members possessed a joint interest in the litigation, and that the named parties adequately would represent

the absent parties. The bill bound all members of the class, absent or present, in the eventual judgment, preventing multiplicious litigation. 7 Wright & Miller § 1751 at 504.

The bill of peace migrated to the United States, gradually becoming the class action. As the class action device developed in the federal judiciary, courts differed over whether absent class members could be bound by a judgment obtained by self-appointed class advocates. From 1842 to 1912, federal equity courts were bound by the proviso of Equity Rule 48:

> "But, in such cases, the decree shall be without prejudice to the rights and claims of all the absent parties.[1]

The lack of a judgment binding on absent class members severely hampered the achievement of the original purpose of the bill of peace.

In 1912, Equity Rule 38 replaced Rule 48, omitting the *proviso:*

> "When the question is one of common interest to many persons constituting a class so numerous as to make it impracticable to bring them all before the court, one or more may sue or defend for the whole." [2]

The omission of the *proviso* inferred that absent parties might be bound by a class judgment under Rule 38. In 1921, the United States Supreme Court gave credence to that inference by holding, in *Supreme Tribe of Ben-Hur v. Cauble,* 255 U.S. 356, 41 S.Ct. 338, 65 L.Ed. 673 (1921), that a class action bound all class members who were represented properly. *Cauble,* however, did not put the controversy to rest.

In 1940, the Supreme Court faced a suit brought by a number of persons to enjoin an alleged breach of a restrictive covenant. The case arose in state court under state class action procedures, but the principles of due process of law under the Fourteenth Amendment to the United States Constitution, as the Court outlined them in *Hansberry v. Lee,* 311 U.S. 32, 61 S.Ct. 115, 85 L.Ed. 22 (1940), are no less stringent than those of the Fifth Amendment that apply to the federal district courts. The Court stated the general principle of American law that no person is bound by a judgment to which he is not a party. 311 U.S. at 40, 61 S.Ct. at 117. The class action is the recognized exception to that rule. *Id.*

The class action exception is not without limitations, and the Court analyzed the limitations of constitutional proportions. First, absent class members must have been afforded the requisite notice and opportunity to be heard that the Constitution requires. Second, a court considering the propriety of class status must examine other factors:

> "In such cases where the interests of those not joined are of the same class as the interests of those who are, and where it is considered that the latter fairly represented the former in the prosecution of the litigation of the issues in which all have a common interest, the court will proceed to a decree." 311 U.S. at 41–42, 61 S.Ct. at 118.

The only failure of due process in a class suit, said the Court, occurs when the procedure used does not fairly protect the interests of absent parties that the decree will purport to bind. *Id.* Under *Hansberry's* rationale, due process in a class action setting requires: (1) notice, (2) opportunity to be heard, (3) common interests of present and absent parties, and (4) adequate representation of the interests of absent class members by the named parties. Rule 23(c)(1) of the Federal Rules of Civil Procedure implements the principles of *Hansber-*

---

1. The full text of Rule 48 stated: "Where the parties on either side are very numerous, and cannot, without manifest inconvenience and oppressive delays in the suit, be all brought before it, the Court in its discretion may dispense with making all of the parties, and may proceed in the suit, having sufficient parties before it to represent all the adverse interest of the plaintiffs and the defendants in the suit properly before it. But in such cases, the decree shall be without prejudice to the rights and claims of all the absent parties." Quoted in 7 Wright & Miller § 1751 at 508 n. 22.

2. Quoted in 7 Wright & Miller § 1751 at 509 n. 26.

ry by providing a certification procedure for class actions. As Professors Wright and Miller stated:

"Thus, if an action satisfies all the requirements in Rule 23(a), the parties comply with the notice provisions in the rule, and the court properly exercises its powers under subdivisions (c) and (d) so that the case is handled in a fair and efficient manner, it is highly likely that all the prerequisites for giving the decree binding effect are present." 7A Wright & Miller § 1789 at 177.

■ *Gonzales v. Cassidy,* 474 F.2d 67, 72 (5th Cir. 1973), implies that class action status must be extant at two stages, prior to trial and after the presentation of the evidence. *Gonzales* and the certification procedure of Rule 23(c)(1) impose on the Court a continuous duty to protect the absent parties, insuring that they are not cast in judgment without vigorous representation of their interests. The Court, as trustee for the absent parties, must evaluate the class representative's conduct of the entire litigation. 474 F.2d at 72. *See Stavrides v. Mellon National Bank & Trust Co.,* 60 F.R.D. 634 (W.D.Pa.1973). If absent parties' interests are not protected adequately, for the Court to attempt to bind them in judgment would deprive them of their day in court. *EEOC v. Detroit Edison Co.,* 515 F.2d 301 (6th Cir. 1975). Indeed, unless they are represented adequately at every stage in the proceeding, the Court is powerless to bind them to a judgment. *Gonzales v. Cassidy, supra.*

Because only another court can determine the *res judicata* effect of a final judgment, a judgment purporting to bind absent parties whose interests have been represented with dubious effectiveness acquires a particularly suspect character. The doubt as to adequacy of representation, and therefore binding effect, may give rise to new suits on the same subject matter by absent class members against the same defendants. The very likelihood of the new actions, even if they are decided against the class on *res judicata* grounds, defeats the historical purpose of the class action, to prevent a multi-plicity of suits. Attempting to bind absent parties without adequate representation, then, not only prejudices the absent class members, but also fails to provide a safe harbor in which the party adverse to the class can rest. The protection of the judgment is merely illusory. If the Court has substantial doubt as to the adequacy of representation, it should act pursuant to its protective responsibility to deny or revoke class certification.

■ Just what measure of representation is adequate is a question of fact that depends on each peculiar set of circumstances for resolution. *Johnson v. Georgia Highway Express, Inc.,* 417 F.2d 1122 (5th Cir. 1969); *Aamco Automatic Transmissions, Inc. v. Tayloe,* 67 F.R.D. 440 (E.D.Pa.1975). The Court, however, in its decision should articulate some standard by which the advocacy of the named party can be judged. The standard enables the party before the Court to know by what measure he was judged and provides a barometer to predict future decisions.

■ The standard, however it may be articulated, must impose stringent guidelines on prospective class representatives. *See, e. g., EEOC v. Detroit Edison Co.,* 515 F.2d 301 (6th Cir. 1975); *Gonzales v. Cassidy,* 474 F.2d 67 (5th Cir. 1973); *Johnson v. Georgia Highway Express, Inc.,* 417 F.2d 1122 (5th Cir. 1969); *Eisen v. Carlisle & Jacquelin,* 391 F.2d 555 (2d Cir. 1968) (*Eisen II*). Thoroughness is essential to insure that absent class members receive their full measure of due process rights. Judge Godbold, in his concurring opinion in *Johnson v. Georgia Highway Express, Inc., supra,* postulated the specific risk of poor class representation in employment discrimination cases:

"One act, or a few acts, at one or a few places, can be charged to be part of a practice or policy quickening an injunction against all racial discrimination by the employer at all places. It is tidy, convenient for the courts fearing a flood of Title VII cases, and dandy for the employees if their champion wins. But what of the catastrophic consequences if

the plaintiff loses and carries the class down with him, or proves only such limited facts that no practice or policy can be found, leaving him afloat but sinking the class?" 417 F.2d at 1126.

In an early case, the United States Supreme Court examined what type of representation would support a binding class judgment. In *Smith v. Swormstedt,* 57 U.S. (16 How.) 288, 14 L.Ed. 942 (1853), members of a religious group sued for themselves and "in behalf of the travelling and worn out preachers in connection with the society of the Methodist Episcopal Church South in the United States. . ." *Id.* at 298, Justice Nelson, relying on Justice Story's treatise on Equity Pleading, stated that the representatives must so advocate the class position that the interests of absent parties would be fully and honestly tried. *Id.* at 302. The resulting decree then would bind all parties.[3]

The United States Court of Appeals for the Eighth Circuit affirmed the trial court's denial of class certification in *Wright v. Stone Container Corp.,* 524 F.2d 1058 (8th Cir. 1975). Among other shortcomings, the plaintiff failed adequately to represent the class during the course of the trial. For example, he neglected to join the union as a defendant when under the facts and the prevailing law the union apparently would bear some blame for the alleged unlawful employment practices. 524 F.2d at 1062. The Court refused to allow the named plaintiff to represent a class in light of the inadequate performance.

*Eisen v. Carlisle & Jacquelin,* 391 F.2d 555 (2d Cir. 1968), commonly called *Eisen II,* probably is the best known case discussing the standards for adequate representation. Judge Medina began his discussion by recalling the functions and effect of a class action. It functions, he said, to prevent repetitious litigation by resolving the claims of many individuals simultaneously and to provide a method for small claimants to pursue their rights when their claims would be too small to warrant individual actions. In turn, the effect of a class action is to bind all members of the class, absent or present, to the judgment. 391 F.2d at 560. Judge Medina stated that Rule 23, F.R.C.P., implements the function and effect he described and that the requirement of adequate representation deserved particular attention. *Id.* at 562.

*Eisen II* states that the trial court must scrutinize the representation of the class by the named party very carefully in every class action. To be an adequate representative, the party must be so situated that he is not joined in collusion with his opponent to the detriment of the absent class members. In addition, his interest must not be antagonistic to the interests of the other class members. Finally, the party's attorney must be "qualified, experienced and generally able to conduct the litigation." 391 F.2d at 562.

In *Johnson v. Georgia Highway Express, Inc.,* 417 F.2d 1122 (5th Cir. 1969), the United States Court of Appeals for the Fifth Circuit adopted Judge Medina's criteria as its own. *Id.* at 1125. Then, in *Gonzales v. Cassidy,* 474 F.2d 67 (5th Cir. 1973), the court elaborated on the requirement of adequate representation. To meet the test, the purported representative must have a common interest with the class and must vigorously prosecute the interests of the class through qualified counsel. *Id.* at 72. Vigorous prosecution should result in tenacious protection of the interests of absent parties. *Id.* at 75.

The implication of the cases concerning adequacy of representation is that a party who wishes to prosecute an action on behalf of a class must protect the rights and interests of absent class members vigorously, tenaciously and effectively. He must meet the standard at every stage of the proceeding, including preparation of pleadings, pretrial motions, discovery, the trial itself, including the presentation of

---

**3.** Interestingly, *Smith* was decided during the tenure of Federal Equity Rule 48, which contained the non-binding proviso. Nonetheless, Justice Nelson concluded that fully represented parties, though absent, would be bound in judgment in a representative suit.

evidence, any post-trial briefing, and appeal.

■ As *Eisen II, Johnson* and *Gonzales* insinuate, usually the degree of representation by the named party will be coextensive with the preparation and presentation of the named party's attorney. Moreover, by qualified counsel the cases mean something more than an attorney admitted to practice before the particular federal court hearing the case. Counsel must have sufficient experience and training to satisfy the trial court that he or she will be a strenuous advocate for the class. Counsel need not come to court with a resume and character references with which to prove his effectiveness; rather, his or her conduct in pretrial matters, discovery and the trial itself will be evidence of his or her capability adequately to represent the class. What, then, should the Court expect from the named parties through their attorneys?

■ At the pretrial stage, the Court may expect that the class pleadings will be drawn conclusively and in accordance with the Federal Rules of Civil Procedure. For example, in the case of a class plaintiff, the complaint, concisely and clearly, should allege jurisdiction, the claim, the class and allegations to support entitlement to class status, and the relief sought. Any supplemental pleadings should follow in the same vein. The representative must make the motions to which the class is entitled and defend those made against it. To do so, counsel must prepare the arguments in favor of the class with thorough legal research, demonstrated by accompanying memoranda and other documents that contain competent and substantial legal analysis. Because the rights of numerous persons not before the Court are at stake, pretrial preparation on behalf of the class must proceed with greater vigor and thoroughness, both factually and legally, than the Court might expect in a suit between parties all of whom are present at all stages of pretrial and trial.

■ The standard of thoroughness spills over into the discovery stage. The liberal discovery procedure provided by the federal rules allows counsel for all parties to an action to be prepared for trial on all factual issues and to preserve and protect their clients' positions and evidence. At this stage, as at the early pretrial stage, class counsel owes a greater duty to absent clients than to those who are present. Counsel must undertake substantial discovery to preserve testimony in favor of the class, to rebut possible claims by the parties adverse to the class, and to impeach opposing witnesses. Certainly counsel should propound some interrogatories to opposing parties, and he or she almost always should undertake to depose important witnesses in writing or orally. In a class action alleging broad company policies that are unlawfully discriminatory, it is almost inconceivable that counsel for plaintiffs could be well prepared for trial without deposing company officials who are responsible for those policies. Admittedly discovery may be costly, and cost is a factor especially important in employment discrimination cases. However, if a party seeking to represent a class is unwilling or unable financially to undertake at least some minimum degree of discovery, then that party should not be able to endanger the rights of absent parties. He cannot be said to represent the class with vigor and effectiveness. Just how much discovery is required is a question to be resolved in each circumstance, but certainly more is required than the propulsion of preliminary interrogatories.

At trial, the prospective class representative must put enough evidence forward to support a *prima facie* case for his position and to rebut the position of his opponent. For example, the evidence would include calling the opposing party or his representative on cross-examination if he would be the best witness to show a company practice or policy. It necessarily would include thorough presentation of documentary evidence, with proper explanation by competent witnesses and credible charts if they are necessary. Counsel should insure a logical and smooth transition from witness to witness. Counsel's cross-examination should reflect his thorough preparation using the fruits of

his discovery; his legal arguments and evidentiary objections should be timely, logical and consistent. Finally, he should follow through on his pretrial and trial work with diligent preparation and research of any required post-trial briefs, memoranda, or proposed findings of fact and conclusions of law.

Did plaintiffs, through their retained counsel, adequately represent the class at the pretrial stage? Their complaint sufficiently alleged the jurisdiction of the Court, the statutory and factual grounds for the claims, and the relief they sought. The class status entitlement allegations were bare but passed minimal inspection. In their two pretrial motions, one to sever the issue of liability from that of back pay and the other to certify the case as a class action, counsel argued well in brief and addressed the Court timely. The class had adequate representation at the early pretrial stage.

The representation degenerated in the discovery stage. Plaintiffs' entire discovery effort consisted of a single set of interrogatories and a request for production or inspection of documents and physical evidence. Not a single deposition or notice of deposition appears in the record. The plaintiffs, through their counsel, made no attempt to discover from company officials facts that would prepare them to prove, at trial, the alleged connection between the two companies and any policies or practices established by them. They did not seek to preserve the testimony of any witness, their own or their opponents', through written or oral deposition. Plaintiffs did not undertake sufficient discovery to protect the interests of the parties they sought to represent. Their *pro forma* attempts at discovery could only have left their attorneys faced with a trial for which they were ill prepared. At the discovery stage, plaintiffs failed their fellow prospective class members.

■ Before the Court can determine whether plaintiffs' representation was adequate at the trial, it should examine the proof that would be necessary to present their case. To prove liability, plaintiffs must show that the defendants maintain an unlawful employment practice that operates to discriminate against black women on the basis of their race or sex. 42 U.S.C. §§ 1981, 1983, 2000e–2(a). They need not show that defendants enacted the policy or practice with a discriminatory intent or that the defendants enforced the policy in bad faith; they may prove their case with a mere showing of discriminatory effect. *Albemarle Paper Company v. Moody*, 422 U.S. 405, 95 S.Ct. 2362, 45 L.Ed.2d 280 (1974); *Griggs v. Duke Power Company*, 401 U.S. 424, 91 S.Ct. 849, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971). Plaintiffs may prove the discriminatory effect by the use of statistics. *Griggs v. Duke Power Co., supra; Pettway v. American Cast Iron Pipe Co.*, 494 F.2d 211 (5th Cir. 1974). While statistics alone may show the discriminatory effect of a practice, plaintiffs still should elicit evidence tending to show the *existence* of a practice. In the case of a very strong statistical foundation, the statistics themselves may give rise to an inference of a particular policy or practice.

■ In conjunction with the specific charges of this case, plaintiffs have alleged a discriminatory practice of segregating the two plants. Certainly a dual system of plants or departments, racially segregated, cannot withstand attack under the civil rights acts. *Watkins v. Scott Paper Co.*, 530 F.2d 1159 (5th Cir. 1976); *United States v. United States Steel Corp.*, 520 F.2d 1043 (5th Cir. 1975); *Russell v. American Tobacco Co.*, 528 F.2d 357 (4th Cir. 1975); *Rock v. Norfolk & Western Railway Co.*, 473 F.2d 1344 (4th Cir. 1973); *Local 189, United Papermakers & Paperworkers v. United States*, 416 F.2d 980 (5th Cir. 1969). In every case so holding, however, all plants or departments have been maintained by the same juridical entities. When plaintiffs seek to show a practice between different juridical entities, as these plaintiffs do, they must show facts to justify the Court in piercing the separate identities and treating the organizations as a single unit. If the Court so held, it would extend Title VII

protection beyond the scope of current holdings. *See Watkins, supra; United States Steel, supra; Russell, supra; Rock, supra; Local 189, supra.*

On their presentation of evidence, plaintiffs merely placed the answers to their interrogatories in the record in a lump. Not a single witness used the answers or explained them. The plaintiffs did not call any company official to discern any company policy or practice, with respect to hiring, transfer, promotion or working conditions. In plaintiffs' case-in-chief, there was no testimony by any competent witness as to any company policy or practice. Plaintiffs introduced no manual or company handbook. All of their witnesses were lower level employees who had no knowledge of any company policy. They were not in a position to know company policy. The management officials of the company, who were in a position to know the policy and whom plaintiffs could have called on cross-examination, were not called.

Plaintiffs did not call any competent witness to explain the relationship between the two juridical entities so that the Court might decide that they should be treated as a single unit. In fact, the only evidence on the point that plaintiffs propounded was the bare introduction of defendants' answers to interrogatories. Uncontradicted, the answers establish an estate planning reason, not a discriminatory reason, for the reorganization. No specific testimony was given about the upper levels of management, dual or combined bookkeeping, or any other relationship that would lead the Court to pierce the juridical identities of the two companies. The only evidence of connexity in the record showed that some products went from one plant to the other in stages of production, resulting in a finished product shipped by Shreveport Garment. If defendants' answers to interrogatories are taken as true, they show that both facilities are predominantly black and female,[4] Delta Garment being almost exclusively female. Certainly the Court cannot conclude from

that evidence that one plant was to be all black females and the other all white males, or at least all white. Plaintiffs failed to adduce evidence on one of the most important facets of their case.

In the course of their presentation, plaintiffs introduced charts into the record, and some of the witnesses referred to the charts to show their income. Apparently plaintiffs attempted to show the Court a disparity of income between white and black employees or that white employees were paid more money for the same or similar work than their black female counterparts. The charts show only five white employees, each of which holds a different position. At each of the positions, the charts show that only one person held that position. Thus, without any testimony to show similarity of work, the Court cannot determine whether whites or males are paid more than black females for similar work. Inadequate evidence was adduced for the Court to make a comparison. Moreover, the Court cannot hold that filling a single slot, the only one in the plant, with a white or a male instead of a black female is discriminatory on its face. To substantiate such a claim, plaintiffs would have to show some discriminatory policy in the selection process. They did not even attempt to do so.

The charts themselves were vague and poorly drawn. Plaintiffs never explained to the Court their significance or even the headings from which the Court was to derive factual conclusions. For example, the Court cannot guess what "possible new hirees" means, especially when some dollar amounts appear beside some names in that chart for some years. Many of the names on the charts have no job position beside them. Plaintiffs' preparation and use of the charts was ineffectual.

With respect to the witnesses that plaintiffs called, only one witness had ever worked at Shreveport Garment. Her testimony was brief and established very little about the terms and conditions of employment at the plant. For a plaintiff attempt-

---

4. *E. g.*, in 1974, Delta Garment had 77 employees, of whom 68 were black females and Shreveport Garment had 63 employees, of whom 32 were black and 37 were female.

ing to represent the black female employees and prospective employees at Shreveport Garment to call only one witness from that facility from among many possible ones was almost to ignore the class completely, much less represent them vigorously, tenaciously, and effectively.

None of the witnesses could show any bias toward themselves. All of them had been hired when they applied and two of them had been promoted to supervisory positions. None could name a higher paying job for which they were qualified and sought at either facility. None showed any effect of any transfer policy, if any existed, because none requested transfer. None testified about any white or male employee or about whites or males generally receiving more pay for the same work as black females or about being kept at work when black females were laid off. Plaintiffs' counsel did not ask them any questions about those alleged discrepancies. Perhaps unlawful policies and discrepancies do exist at either or both plants, but the Court cannot find their existence as fact from the paucity of evidence placed before it.

Some of the witnesses complained of working conditions and fringe benefit disparities between whites or males and black females. With respect to breaks, the comparisons that were made were almost exclusively between the unskilled and semi-skilled employees and their supervisors. Such a comparison is an impermissible one to establish a disparity, because the testimony established that the employees and their supervisors worked at different rates on different schedules with different job duties. Plaintiffs attempt to compare the proverbial apple and orange. No witness testified as to any fringe benefits that exist at all. The testimony about fringe benefits essentially demonstrated a desire by employees to have some, but they did not show that any white or male employees received any fringe benefits. No disparity can be shown if *no* employees are entitled to fringe benefits.

Finally, numerous witnesses complained about segregated restrooms at Delta Gar-

ment. Although the "black" and "white" signs were removed after Title VII passed, apparently the company did not take appropriate steps to desegregate the restrooms as a matter of fact. On this single point the testimony was conclusive; defendant Delta Garment maintained an unlawful employment practice by not desegregating its restrooms. *Cf. Rogers v. EEOC*, 454 F.2d 234, 238 (5th Cir. 1971), *cert. denied* 406 U.S. 957, 92 S.Ct. 2058, 32 L.Ed.2d 343 (1972). However, the single point is cold comfort to the Shreveport Garment class *in toto* and to the Delta Garment class with respect to their other possible claims. The Court can fashion effective injunctive relief in the individual action to relieve the problem, so that the adequate representation on this single point need not, and cannot, support class status, standing alone as it does.

The last determination on the presentation of evidence concerns the adequacy of the statistical evidence. The Court does not consider the charts as adequate statistical evidence, for reasons given above. Plaintiffs attempted to place a statistical expert on the stand to testify and the Court, upon objection by defendant, disallowed the testimony. Plaintiffs then made an offer of proof out of the presence of the trier of fact.

Plaintiffs' counsel, at the time of trial, had been before this Court in several individual actions. They were fully aware of the Court's standing pretrial notice concerning the preparation of the pretrial order. The notice clearly states, in subsection (A)(1);

"1. Not later than sixty days after the case is at issue, the attorneys for the parties appearing in the case shall personally:

"(a) Discuss their respective contentions as to the facts which they believe are material in the case and their respective contentions as to the rules of law which they deem applicable in the case.

"(b) Display to each other all exhibits (other than those to be used for

impeachment) tentatively intended to be offered in evidence at trial.

"(c) Exchange a list of witnesses (other than impeachment witnesses) tentatively intended to be called at trial, together with a *brief* summary of their proposed testimony." (Emphasis in original.)

In addition, the notice, in subsection (C)(1)(n), requires the inclusion of a list of non-impeachment witnesses in the pretrial order. This Court's consistent sanction for failure to comply with the pretrial notice has been exclusion of the offending evidence or contention.

Plaintiffs' counsel had sufficient experience before the Court to have known that the sanction would be imposed. Moreover, a statistical witness does not "pop up" at the last minute. Counsel had to provide him with the facts with sufficient time to prepare for testimony at trial. Counsel apparently ignored the Court's standing order and the rights of the defendants under federal pretrial procedure and attempted to introduce a surprise witness. Because the case had been in progress for many months, and because the Court was faced with a case of either deliberate disregard or inexcusable neglect of the order, the Court did not feel that the interests of justice demanded a continuance of the trial so that the plaintiffs' counsel could comply with the Court's standing pretrial procedure. Therefore, it imposed its normal sanction by excluding the testimony of the statistical expert. Pre-trial Notice (c)(2), Western District of Louisiana, Shreveport Division, Stagg, J.[5]

The only statistical evidence in the record, then, is the raw data from the answers to interrogatories. Not a single witness or any chart explained any part of the interrogatories to the trier of fact for his edification. Nonetheless, the Court undertook to examine the data carefully.

To give the Court a basis for comparison, plaintiffs placed in evidence United States Bureau of the Census data from the 1970 census. While the Court may and does take judicial notice of the information on the Shreveport SMSA, the particular information placed in evidence is of no help. Plaintiffs placed *employed* male, female, Negro and total experienced labor force data in evidence. The relevant labor pool should have included total population of adults, with appropriate breakdown by race and sex. As the trial record stands, the goal that plaintiffs would have defendants meet in managerial positions would be 183/9452,[6] or about 1.9%; the goal for clerical positions would be 651/15,936,[7] or 4.1%. Those goals applied in either plant would require fewer than one black female in either position. Thus, accurate statistical comparison is impossible due to plaintiffs' poor preparation of their statistical case.

The statistics do not show that defendants maintained the two plants segregated by race or sex. Both plants employed a majority of blacks and a majority of females. The Court, therefore, cannot conclude by virtue of the statistical data that the plants remained separate for race or sex segregation purposes. The Court must examine the statistics at each plant to determine if the statistics might prove a case of discrimination in either.

One major problem with the statistical showing at the two plants is the size of the statistical sample from which the Court is asked to draw its inferences. If one accepts the hypothesis that a vast disparity be-

---

5. "No exhibits or witnesses . . . shall be used at the trial unless listed in the pre-trial order, except for good cause shown." *See* F.R. C.P. 16.

6. The census data shows that the total male labor force employed in management was 7913; the total female was 1539; the total labor force was 9452. The total number of black females employed in management positions was 183. Thus, the ratio of 183/9452 yields 1.93%. The

income disparities were even more pronounced. See Plaintiffs' Exhibit P–3.

7. The census data shows a total male labor force of 4562 in the clerical area; the total female was 11,374; the total clerical labor force was 15,936. The total number of black females employed in clerical positions was 651. Thus, the ratio of 651/15,936 yields 4.085%. The income disparities were even more pronounced. See Plaintiffs' Exhibit P–3.

tween the number of employed persons in a particular category of an historically unprivileged group (blacks or women) and the number of employed persons in a particular category of an historically favored group (white males) gives rise to an inference that an impermissible bias caused the disparity, as the United States Court of Appeals for the Fifth Circuit has mandated, then a *prima facie* case of unlawful discrimination consists of demonstrating the disparity statistically. However, human reason dictates that many explanations exist for a failure to place a particular person in a particular position. The probability that some other reason than race was the primary motivation in a certain group decreases as the number of persons in the population increases; it increases as the population decreases. Thus, the fewer the persons in the statistical population, the weaker is the inference to be drawn from bare statistics without accompanying testimony. For example, suppose that there are ten persons in an employer's statistical population, all of whom are white. The comparable percentage of blacks in the community population might be 20%. Therefore, the inference could be drawn that in two employment decisions racial prejudice was the deciding factor. But considering the large number of possible factors in making the decision, the likelihood that race was determinative in two out of two or none out of two decisions is very small. The situation would give rise to a much stronger inference if there were 1,000 persons in the statistical group, 100 of which were black, with a general black population of 20%. While the percentages are greatly more disparate in the first example (0–100% as compared to 10–90%), the chance of random factors entering the decision is much less likely when 100 statistically improper decisions are made than when only two are made. *See generally* R. Langley, Practical Statistics Simply Explained 11–18 (rev.ed. 1970); R. Reichard, The Numbers Game 237–261 (1972). *See also* Comment, Beyond the Prima Facie Case in Employment Discrimination Law; Statistical Proof and Rebuttal, 89 Harv.L.Rev. 387, 394–401 (1975).

The department-wide statistics at Delta Garment do not show a disparity at all. The felled seam and safety stitch departments employ black females almost exclusively. At the time of trial, the administrative department employed no black females, but in 1973 and 1974 it was approximately one-third black and one-third female. Without accurate statistics on the available work force, the Court cannot conclude that a bias exists either racially or sexually on the basis of the figures. Moreover, with only nine employees in the administrative department in 1973 and seven in 1974, the Court cannot conclude from the meager statistics that any practice, discriminatory or non-discriminatory, existed in that department. The statistical sample simply is too small to project accurate findings, especially in light of plaintiffs' poor presentation of population statistics.

A look at the dispersion among individual jobs also does not establish a statistical case of unlawful discrimination because the number of people in the particular positions not occupied by black females is too small. There is only one manager, three supervisors (two of whom are black females), one clerical worker, one machinist, and one pattern maker. In short, plaintiffs failed to present a statistical case with respect to Delta Garment.

The statistics for Shreveport Garment are equally deficient. In every year for which the defendant supplied figures in answer to plaintiffs' interrogatories, more blacks than whites and a substantial number of black females were included in the work force at the facility; hence no case can be made for a failure to hire black females on the basis of the available figures. In the breakdown by departments, black females have respectable representation in the pressing and shipping departments. No blacks at all are employed or have been employed in the administrative department, but the statistical sample is too small to bear plaintiffs' entire case absent supporting testimony. No black females work in the cutting department; however, this Court will not allow plaintiffs to base their class action rep-

resentation on the raw datum that none of the 16–20 employees of the department is a black female. They offered no oral testimony as to that department when much could have been extracted. To allow such a presentation to bear plaintiffs' burden to prove a *prima facie* case would mean that a plaintiff could introduce into evidence a single answer to a single interrogatory concerning a single department and then rest his case, being entitled to judgment absent rebuttal. While statistics may show a *prima facie* case, this Court does not and cannot hold that such a meager effort can be considered sufficient evidence to shift the burden to defendant. Plaintiff proved no statistical case against Shreveport Garment.

■ In conclusion, from the discovery stage through trial on the merits, plaintiffs, through their retained counsel, failed adequately to protect the interests of absent class members whom they desired to represent. They undertook virtually no discovery, they presented very little evidence on most points and none at all in some crucial areas, and their statistical analysis lacked reliability and thoroughness. The Court would act with indifference toward the rights of the absent parties should it conclude those rights based on the poor presentation of the named plaintiffs.

The raw data and vague testimony give rise to inquiries by the Court due to their hint of discrimination. However, the Court may decide issues only on the basis of the evidence in the record. It cannot take judicial notice of community attitudes or engage in unsubstantiated hypothesis about policies that do not appear in the record. The absent parties should not be bound by the shortcomings of advocates whom they did not choose.

The certification of the action as a class action is hereby revoked. The Court shall treat the cause as an individual action by the named plaintiffs.

## THE INDIVIDUAL ACTIONS

■ The United States Supreme Court set forth the requirements of proof in an individual case of employment discrimination in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). The plaintiff bears the burden of proving discrimination. *McDonnell Douglas Corp. v. Green, supra; Thomas v. J. C. Penney Co., Inc.*, 531 F.2d 270 (5th Cir. 1976). *McDonnell Douglas* dealt with a refusal to hire due to race, and the Court held that plaintiff must prove (1) membership in a racial minority, (2) application and qualification for the particular job, (3) rejection despite qualification, (4) failure by defendant to fill the position and continuance in the search for a person to fill it.

■ Both Vivian Johnson and Dorothy Burton apparently were hired at their first application at Delta Garment. Neither of them was discharged or demoted against her will. Thus, their claims must be for failure to promote them, failure to pay them equal pay for equal work, or failure to maintain equal working terms and conditions. To prevail, they must prove their membership in an historically underprivileged class, their application and qualification for a particular job, pay or working term or condition, denial to them of that which they sought, and allowance of that which they sought to members of historically privileged groups. *Cf. McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973).

## FINDINGS OF FACT

1. Defendants Delta Garment and Shreveport Garment operate manufacturing establishments whose goods flow in interstate commerce. They employed 77–100 and 56–63 employees, respectively, from 1970 through 1974.

2. Plaintiff Vivian Johnson first gained employment at Delta Garment on March 16, 1954. She worked as a bar tacker there until July, 1973, when she resigned because she made too little money. She never applied or worked at Shreveport Garment.

3. Ms. Burton applied at Shreveport Garment but was told there were no openings in June, 1969. Then she was contacted

by Delta Garment and began work there as an inspector, continuing until the present. She never worked at Shreveport Garment.

4. Ms. Johnson filed a charge with the Equal Employment Opportunity Commission (EEOC) on May 22, 1973. She received a notice of her right to sue from the EEOC, dated February 14, 1974. She commenced this action on May 15, 1974.

5. Ms. Burton filed a charge with EEOC on May 23, 1973. She received notice from EEOC of her right to sue, dated February 14, 1974. She commenced this action on May 15, 1974.

6. Ms. Johnson was paid by a base rate plus production. She received a minimum rate per hour, which varied over the years, and a bonus for production above a certain level; the bonus also fluctuated over the years. She always received a greater base rate than the federal minimum wage.

7. Ms. Burton was paid in a similar manner to Ms. Johnson, although her rates differed.

8. Ms. Johnson, Ms. Burton and other witnesses testified that their white counterparts received more pay for the same work, but no testimony or documentary evidence showed whether the discrepancy existed and, if it did, the amount of the difference. Plaintiff's charts did not show any comparable white or male employee who made a greater rate of pay for the same work. The uncontradicted company evidence showed that all workers with the same job were paid in the same manner at the same rate. The Court finds as a fact that Ms. Johnson and Ms. Burton received the same base rate and production rate as any white or male employee in similar circumstances.

9. Ms. Johnson never sought any promotion or transfer to any other position at Delta Garment. She testified that she did not want to be a supervisor or floor lady, the next position that would have been a first level promotion. She admitted that she was not qualified to work in a clerical or administrative capacity.

10. Dorothy Burton never applied for promotion or transfer. She did not want to be a floor lady, the next step in promotion for her. She did not testify as to whether she was qualified in any clerical or administrative capacity.

11. Neither Ms. Burton nor Ms. Johnson ever sought transfer to Shreveport Garment.

12. Prior to 1964, Delta Garment maintained segregated restrooms marked "black" and "white". In 1964 the company removed the signs but not the stigma attached to them. The testimony of Ms. Johnson, Ms. Burton and several other of their witnesses establishes that the company did little or nothing to improve the degrading effect of the segregation. The black women were subjected to stares and ugly glances by white employees when they attempted to use the formerly all-white restroom. Plaintiff proved by a preponderance of the evidence that the denigrating glances came from company management personnel also. As a result, plaintiffs "voluntarily" used the formerly all-black restroom. They did not show any actual damages that accrued because of their humiliation.

13. The evidence showed that there existed no collective bargaining agreement or agent among the employees at Delta Garment. The company maintained no formal or informal seniority system.

14. Ms. Johnson did not complain that she was the victim of discrimination in any other way than pay and the restroom segregation. She did not feel aggrieved about any breaks, phone calls, or the like, although other witnesses did. She did not seek any further fringe benefits; indeed, the evidence was insufficient to establish that any fringe benefits were extended to any employees. Thus, the Court must find that no fringe benefits enured to the good of any employee; Ms. Johnson was treated in the same way as all other employees in that respect.

15. The only other practice of which Ms. Burton complained was her restricted use of the "unit" phone compared to the extensive use made of it by the white female

supervisor and black male mechanic. However, she did not show that any white or male employee of her same stature was allowed more generous use of the "unit" phone. The Court finds as a fact that she was not treated differently from her white or male counterparts with respect to working conditions other than the segregated restrooms.

## CONCLUSIONS OF LAW

1. Defendants Delta Garment and Shreveport Garment are employers within the meaning of 42 U.S.C. § 2000e–2(a). 42 U.S.C. § 2000e(b).

2. Defendants Delta Garment and Shreveport Garment are persons within the meaning of 42 U.S.C. §§ 1981, 1983.

3. Because plaintiff Vivian Johnson filed a charge with the EEOC within 180 days of the ending of the alleged unlawful employment practice, the practice being of a continuous nature during her entire employment, and she sued within 90 days of receiving notice of her right to sue in federal district court, she has fulfilled the requirements of Title VII of the Civil Rights Act of 1964. 42 U.S.C. § 2000e–5(e), (f)(1).

4. Plaintiff Dorothy Burton met the procedural requirements of 42 U.S.C. § 2000e–5(e), (f)(1).

5. The alleged injury to plaintiff Vivian Johnson continued until her resignation. The prescriptive period for money damages under 42 U.S.C. §§ 1981, 1983 in Louisiana is one year, the period for injunctive relief is ten years. *Hines v. Olinkraft*, 413 F.Supp. 1360 (W.D.La.1976); La.Civ.Code arts. 3534, 3544.

6. With respect to the claims under 42 U.S.C. § 2000e, *et seq.*, the limitation period tolls with the filing of the charge with the EEOC. *Hines v. Olinkraft, supra.*

7. With respect to the claims under 42 U.S.C. §§ 1981, 1983, the limitation period tolls with the filing of the lawsuit. *Hines v. Olinkraft, supra.*

8. Plaintiff Vivian Johnson filed her claim timely with the EEOC and this Court. It has not prescribed.

9. Plaintiff Dorothy Burton timely filed this suit for injunctive and monetary relief under 42 U.S.C. §§ 1981 and 2000e *et seq.*

10. Plaintiffs showed no state action on the part of any party. State action being required proof in an action pursuant to 42 U.S.C. § 1983, plaintiffs stated no claim under that section.

11. Plaintiffs did not mention any conduct on the part of Shreveport Garment, nor did the other testimony establish any. Therefore, they did not prove any claim against it. The claims of Vivian Johnson and Dorothy Burton against Shreveport Garment Manufacturers of Louisiana should be dismissed.

12. Plaintiffs failed to sustain their burdens of proof of disparate treatment with respect to pay, promotion, transfer or working conditions, except for the segregated restrooms. They did not show that they were the victims of any employment discrimination directed at them with respect to those items. *Thomas v. J. C. Penney Co., Inc.*, 531 F.2d 270 (5th Cir. 1976); *cf. McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973).

13. With respect to the segregated restrooms, plaintiffs have stated and proven a case of employment discrimination. Under § 1981, they were not given the same rights and entitlement to that white citizens enjoyed. Instead, they were humiliated and degraded by being herded into "their places" by white management personnel at Delta Garment. In terms of 42 U.S.C. § 2000e–2(a), they were adversely affected in their status as employees by the segregation according to race. 42 U.S.C. § 2000e–2(a)(2).

14. The testimony showed that the company removed the "white" and "black" signs from the restrooms in 1964. No other action was taken to eliminate the practice of segregating the restrooms. Equal employment opportunity demands that employers place persons who have been

the target of discrimination in their "rightful places" to avoid liability for unlawful employment practices. *Franks v. Bowman Transportation Co., Inc.,* 424 U.S. 747, 96 S.Ct. 1251, 47 L.Ed.2d 444 (1976); *Watkins v. Scott Paper Co.,* 530 F.2d 1159 (5th Cir. 1976). It is not enough that the effects of discrimination be reduced. As Judge Wisdom said in *Scott Paper:*

> "The question is not whether the opportunities afforded by Scott were 'ample' in the sense that they substantially reduced the effects of prior discrimination. The question is whether Scott has done enough. And 'enough' means, for the purposes of Title VII, everything that is possible." 530 F.2d at 1168.

15. The only positive action that defendant Delta Garment took with respect to the restrooms was the removal of the signs. The stigma of color still exists, fortified by the ridicule of white management personnel. Delta Garment must sustain liability for failing to "do enough" to eliminate the effects of past discrimination. Its liability is limited to damages caused by the segregated restrooms.

16. Ms. Johnson proved no other liability for her claims on the part of defendants. She is not entitled to injunctive relief to relieve the segregated restroom problem because she no longer works or desires to work at the Delta Garment facility. The Court finds that she suffered no actual damages due to embarrassment but, as its discretion permits, awards $300 as nominal and punitive damages.

17. As she is still employed at Delta Garment, Ms. Burton is entitled to injunctive relief to dissolve the stigma and humiliation of the segregated restrooms. In addition, the Court, as its discretion permits, awards $300 as nominal and punitive damages for Delta Garment's continued maintenance of segregated restrooms.

## ATTORNEY FEES

The Court spent much of its opinion discussing the shortcomings of plaintiffs in prosecuting the class action aspects of this lawsuit. As the award of attorney fees is within the discretion of the Court, and because so much of plaintiffs' failing must be attributed to their attorneys, the Court declines to award plaintiffs' attorneys any fee for their service.

## ORDER

For the above-stated reasons, IT IS HEREBY ORDERED:

(1) That the certification of this cause as a class action be revoked, the action to proceed as a demand for individual relief;

(2) That the claims of Vivian Johnson and Dorothy Burton against Shreveport Garment Manufacturers of Louisiana be dismissed *in toto,* costs to be borne by plaintiffs;

(3) That judgment be entered in favor of plaintiff Vivian Johnson and against defendant Delta Garment Corporation in the sum of Three Hundred and No/100 ($300.00) Dollars, costs to be borne by defendant Delta Garment Corporation;

(4) That judgment be rendered in favor of plaintiff Dorothy Burton and against defendant Delta Garment Corporation in the sum of Three Hundred and No/100 ($300.00) Dollars, costs to be borne by defendant Delta Garment Corporation;

(5) That defendant Delta Garment Corporation be enjoined from further segregation of its restroom facilities between white and black employees;

(6) That defendant Delta Garment Corporation institute a program affirmatively to alleviate the pressure on black employees to use formerly all-black restrooms and to discipline its management personnel that obstruct the desegregation of restrooms at the facility; and

(7) That the request by plaintiffs for an award of attorney fees be denied.

## JUDGMENT

This action having come on for trial before the Court, Honorable Tom Stagg, District Judge, presiding, and the issues having been duly tried and a decision having been duly rendered,

IT IS ORDERED AND ADJUDGED:

(1) That the certification of this cause as a class action be revoked;

(2) That there be judgment in favor of Shreveport Garment Manufacturers of Louisiana and against Vivian Johnson and Dorothy Burton, dismissing the claims of Vivian Johnson and Dorothy Burton on the merits, and that Shreveport Garment Manufacturers of Louisiana recover of Vivian Johnson and Dorothy Burton its costs of this action;

(3) That there be judgment in favor of plaintiff Vivian Johnson and against defendant Delta Garment Corporation in the sum of Three Hundred and No/100 ($300.00) Dollars, plus legal interest from May 22, 1973, plus her costs of this action;

(4) That there be judgment in favor of plaintiff Dorothy Burton and against defendant Delta Garment Corporation in the sum of Three Hundred and No/100 ($300.00) Dollars, plus legal interest from May 23, 1973, plus her costs of this action;

(5) That defendant Delta Garment Corporation is enjoined from further segregation of its restroom facilities between white and black employees;

(6) That defendant Delta Garment Corporation institute a program affirmatively to alleviate the pressure on black employees to use formerly all black restrooms and to discipline its management personnel that obstruct the desegregation of restrooms at the facility; and

(7) That plaintiffs' request for an award of attorneys' fees be DENIED.