Pamela Sue SMITH, Individually and on behalf of all others similarly situated, Plaintiff,

v.

JOSTEN'S AMERICAN YEARBOOK CO., Defendant.

No. 76–67–C5.

United States District Court, D. Kansas.

Memorandum and Order Jan. 23, 1978.

On Rehearing April 11, 1978.

Fred W. Phelps, Topeka, Kan., Arnold Levin and Gordon Gelfond, Philadelphia, Pa., for plaintiff.

Stewart L. Entz, Topeka, Kan., Herbert A. Marshall, Topeka, Kan., Orville E. Fisher, Judith Roberts-Bell, Josten's, Inc., Minneapolis, Minn., for defendant.

## MEMORANDUM AND ORDER

ROGERS, District Judge.

On the date originally scheduled for a hearing on the question of class action certification, the above-captioned case came before the Court for hearing on four recently-filed motions which it was felt should be decided prior to the motion for class designation. These are defendant's motion to allow attorneys' fees and costs; defendant's motion to dismiss; the motions of Fred Phelps, Chartered, Arnold Levin, Gordon Gelfond (hereinafter "plaintiff's counsel") and William B. Glenn to withdraw as attorneys of record for plaintiff; and the motion of Arline Earley that she be allowed to intervene or join the action as a party plaintiff. Oral argument was heard December 16, 1977, on all four motions, and the motions to withdraw were granted. Having considered the testimony and evidence then presented, the file in the case, and the law applicable to the various questions presented, the Court is now prepared to rule on the remaining motions.

This is an employment discrimination case. There is some question as to which statutes create plaintiff's purported cause of action, as will become clear below, but the basic framework of the case clearly fits within 42 U.S.C. § 2000e *et seq.* Plaintiff took the prerequisite administrative steps by filing a charge of discrimination with the EEOC and receiving a "right-to-sue" letter prior to bringing this action. Because the sequence and nature of the pleadings filed in this case are important in light of issues raised by the motions before us, we will recount their salient features at some length.

The charge of discrimination filed with the EEOC was attached as exhibit "A" to the original complaint, and reflects it was filed June 10, 1975. The charging party is listed as "Ms. Pamela Sue Smith (class action)." The charge was filed against "hundreds" of "company officials." In the space provided for explanation of the charge is a general, across-the-board allegation of discrimination [1] against blacks and females, concluding with the following sentence: "This is a class action, for the above-named charging party, and all others similarly situated, being all blacks and other minorities and females." In a blank stating, "the following person always knows where to contact me," there is written "Mr. Fred W. Phelps, Attorney for charging party and class." The charge is signed by plaintiff and notarized by Betty Joan Phelps. It is thus evident the charge was prepared by counsel.

On February 18, 1976, plaintiff was issued a "right-to-sue letter." Thereafter, on April 26, 1976, a complaint was filed initiating the present action. The complaint recites the case arises under "the First, Thirteenth and Fourteenth Amendments of the United States Constitution, The Civil Rights Act of 1866, 42 U.S.C. Section 1981, 42 U.S.C. 1983, 42 U.S.C. Section 1985, The Civil Rights Act of 1964 as amended, 42 U.S.C. Section 2000d and 42 U.S.C. Section 2000e *et seq.* (hereinafter "Title VII") and the Kansas Acts Against Discrimination, K.S.A. § 44–1001 *et seq.*"

---

1. The charge reads:

The employer uniformly and systematically discriminates against blacks as a class, and females as a class, including the above-named charging party, in hiring, promotion, discharge, classification, layoffs, compensation, benefits, terms and conditions of employment. White and male applicants and employees receive preferential treatment and opportunities in hiring, promotion, discharge, classification, layoffs, compensation, benefits, terms and conditions of employment . . .

On June 15, 1976, plaintiff propounded a 23-page set of 85 interrogatories to defendant. These were typed in small type without spaces to answer, and most contained subparts. Plaintiff requested very detailed information on all phases of defendant's operations including breakdowns of various figures according to race, although in some questions "sex" or "female" is inserted in a missized blank in different type.

The Motion for Designation as a Class Action was filed June 16, 1976, the next day. Although the EEOC charge alleged racial discrimination, the class sought to be certified is sex-based only.[2] Plaintiff's name and the case caption is typed thereon in darker type than is used in the rest of the motion. The space wherein plaintiff's name is inserted is several spaces longer than it need be. A paragraph concerning the impracticability of joinder recites that "the approximate size of the class is —— persons." Generally the motion recites in conclusory fashion the requirements of Rule 23. It is evident that the document is a form motion rather crudely adapted for use in this action.

Pursuant to Local Rule 15(b), any motion in a civil case must be accompanied by a written memorandum. Thus also filed on June 16 was plaintiff's memorandum in support of the motion for class action determination. The brief is nineteen pages long. Again, a cursory examination of the type used in preparing this document reveals that only the first two pages of the brief, those which refer to plaintiff by name,

were freshly typed; the remainder are evident copies of a form motion.[3]

On December 30, 1976, plaintiff filed a supplement to the brief in support of class determination. It consists of a five-page list of "cases involving class action litigation which have been handled by plaintiff's counsel . . . [t]his list evidences plaintiff's counsels' involvement in and experience with this type of litigation." Listed are sixty-five case captions. Of these, 42 were filed in Pennsylvania and sixteen in Kansas; the remainder were filed in other states. There is no indication any of the sixty-five cases has proceeded to any resolution.[4]

On January 26, 1977, defendant filed a motion and lengthy supporting brief for dismissal of all claims other than those predicated on 42 U.S.C. § 2000e *et seq.* On January 28, 1977, this Court entered an order striking Counts II through V of the complaint, the demand for jury trial, and the prayer for punitive damages, for the reasons stated in our October 18, 1976 order in another case in which plaintiff's counsel was identical, *Brown v. Frito-Lay,* No. 76–69–C5. Subsequently plaintiff's counsel submitted an amended complaint reflecting a cause of action based upon 42 U.S.C. § 2000e alone.

On April 18, a second set of requests for production, this time more tailored to the issues in the case, was served on defendant. However, on the next day, April 19, plaintiff's counsel filed a "motion to compel and impose sanctions" for failure to answer all

2. Such confusion permeates the initial pleadings. The EEOC charge referred to blacks, females, and "other minorities." The complaint speaks only of "females." Next the interrogatories ask for breakdowns by sex *and race*; then the class motion speaks only of females. These documents were filed in the order mentioned. In the interim between these filings defendant had moved only for an extension of time to respond; no motion to strike race allegations, or indeed, responsive pleading of any type had been filed.

3. The first two pages of the motion disclose the names of plaintiff and defendant, the statutes relied upon, the across-the-board charges, and the dates of filing of the EEOC charge and

complaint. On page 11, in the context of discussing the numerosity requirement, it is stated that "Clearly —— satisfies the requirements of the rule." A more detailed discussion of the "production line" aspects of the motion and brief will be found at n. 11 below.

4. Of all 65 cases, only six are identified with more than docket numbers. These six are cited by term of court and year. While it is possible that the presence of a date reflects that the case has reached some resolution, the fact that only a year is given and that all six are in Pennsylvania Courts of Common Pleas persuades us that this is a unique form of citation and not evidence that any of the sixty-five cases has proceeded to judgment.

**158**

of the original discovery requests. Answers to the interrogatories had been filed February 3, but many interrogatories had been objected to as irrelevant and immaterial to the issues in the case. At the same time plaintiff moved for an order relieving her from any duty to respond to interrogatories propounded to her February 1. Defendant's response to this motion, *inter alia,* noted that the motion was sorely out of time according to prior orders of the Magistrate, and cited five other purported class actions filed the same day as the instant case in which the same stock interrogatories were used. On June 21, 1977, the motion was heard by the Magistrate, who ordered defendant to answer certain interrogatories but upheld defendant's objections as to others. On June 28, 1977, plaintiff moved for review of this order of the Magistrate.

In the motion for review it was asserted that the cut-off date for discovery ordered by the Magistrate was out of keeping with the applicable statute of limitations for plaintiff's claim, since "the Magistrate . . failed to recognize that plaintiff is proceeding, in part, pursuant to 42 U.S.C. 1981." Plaintiff's counsel made this statement more than four months after this Court dismissed the § 1981 claim, and more than four months after plaintiff's amended complaint reflected that fact. The motion also claimed that the interrogatories as to which the Magistrate upheld defendant's objections were "selected at random" for "absolutely no reason." We have recently reexamined the interrogatories which the Magistrate ordered need not be answered. Two of them ask for race breakdowns. Two others are largely incomprehensible. No. 54 in particular refers to the preceding interrogatory, which itself refers to the preceding interrogatory. It is difficult, if not impossible, to discern exactly what is being asked.

Other requests for production, objections, and motions to compel were filed at various times. However, these now take a back seat to the recurring problems defendant encountered in its attempt to take plaintiff's deposition. On June 24, 1977, defendants served notice that the deposition of the plaintiff would be taken July 6. Shortly before July 6, plaintiff's counsel informed defendant of a "conflict" and the deposition was informally scheduled for August 18. Again plaintiff's counsel encountered a "conflict" and apparently the deposition was again rescheduled for September 8. On September 7 plaintiff's counsel moved for an order barring the taking of the deposition the next day for the reason there was "no notice" and that plaintiff's counsel had not been informed of the date of the rescheduled deposition. On October 12, a hearing was held on this motion, which was of course moot by that time, but at the hearing the Magistrate ordered that plaintiff's deposition be taken on October 27.

Plaintiff did not appear on October 27. She has never appeared and cannot be found. No one connected with this case has been in contact with plaintiff Smith since June of 1977. However, a meeting did take place between defendant's counsel and the son of plaintiff's local counsel, who has recently associated himself with his father's practice. A transcript of these proceedings has been made available to the Court, and it reflects that there had been some confusion as to the status of the deposition in light of recent prospects for settlement. Apparently the deposition was tentatively put aside, then reinstated; the record of the October 27 "deposition" reflects the position of plaintiff's counsel that plaintiff was difficult to contact and could not be produced on short notice. Plaintiff's counsel Mr. Phelps was contacted and his words were recorded via speaker phone; he affirmed that plaintiff had been contacted and had been told the deposition was off although he did not make the contact personally but through a Mr. Glenn, and was "a little removed from the situation."

On November 22, 1977, plaintiff's counsel Fred W. Phelps filed a "Motion for Leave to Withdraw and Notice of Intent to Withdraw," in which he moved to be allowed to withdraw "as attorney of record for the said Pamela Sue Smith, and [relieved] of his duties to the court, his said client, and opposing counsel." The next day, November

23, 1977, defendant served on the Philadelphia co-counsel, Messrs. Levin and Gelfond, a notice that plaintiff Smith's deposition would be taken December 2.

The Court signed an order allowing the withdrawal of Mr. Phelps on November 28. Then, upon recalling that the case was indeed styled a class action and that a proposal of settlement had been presented less than a month previously, the order allowing withdrawal was withdrawn November 30. On December 1, 1977, Mr. Phelps moved to quash the deposition scheduled for the next day for the reason he was not served notice, and filed an amended motion to withdraw including Gelfond and Levin. The Court denied the motion to quash for the reason counsel of record, Gelfond and Levin, had been timely served regardless of the confused representative status of Mr. Phelps.

The scheduled deposition took place December 2nd, although the plaintiff was not present. Present were Mr. Phelps, Mr. William E. Glenn, and local and corporate counsel for defendant. A thirty-page transcript of this "deposition" has been furnished the Court, and it is quite similar to the October 27 "deposition." Mr. Glenn asserted he appeared on behalf of plaintiff in addition to Mr. Phelps, although the record does not reflect Glenn had ever appeared on her behalf previously. Defendant's counsel expressed displeasure at their repeated failures to depose the plaintiff, and plaintiff's counsel stated he (they) wished to withdraw because of his (their) complete inability to locate the plaintiff. It is evident from a reading of this document that all settlement prospects were off and opposing counsel were on less than cordial terms. On December 7, 1977, William Glenn filed a motion to withdraw as counsel for plaintiff.

The matter of plaintiff's absence at depositions was discussed at the hearing on the motions now before us December 15. Plaintiff was represented by Mr. Phelps' son, who admitted it appeared plaintiff was "no longer.interested" in the prosecution of the case. Mr. Glenn, who was Mr. Phelps' "contact" with plaintiff, testified that neither he nor anyone else connected with the

case had had contact with the plaintiff since June of 1977. He testified that plaintiff was a "very unstable person" who had been "evading our surveillance." When questioned about the representation that had been made to defendant's counsel at the October 27th deposition setting to the effect plaintiff had been contacted in October, Mr. Glenn said the "Pam Smith" who had called him turned out to be "another Pam Smith" and not the plaintiff. This, he said, led to the misunderstanding in October.

We have referred above to settlement negotiations which took place in late October or early November.

On November 3, 1977, the Court was contacted by defendant's counsel with a request for an immediate hearing on the problems defendant was encountering in discovery. We scheduled such a hearing, and were surprised when counsel for both sides stated they had begun settlement negotiations and wished to present to the Court a tentative proposal of settlement. No mention was made of the discovery problems.

As outlined by defendant's counsel, the proposed settlement encompassed the following points:

(1) The court would certify a nationwide class consisting of female employees and applicants at all of defendant's 23 plants;

(2) The defendant would reiterate its affirmative action plan;

(3) The court would enter no finding of liability against defendant;

(4) The court would order only a general, posted or published notice, and provide for a very short objection period;

(5) There would be a specific judicial finding that due process had been accorded all absent class members;

(6) The order would specify that all claims of class members were adjudicated thereby.

The Court requested a repetition of the proposal and again these six points were listed, although notice was this time re-

ferred to as "posting" only. Defendant made it quite clear that it did not wish to pursue the settlement negotiations any further unless the Court found that the proposal would satisfy the requirements of due process and would dispose of any potential claims inuring to absent members of the class up to the date of approval of settlement.

Asked to comment upon the proposal, plaintiff's counsel asserted that "such decrees are commonplace," and affirmed that the proposed settlement should bind all class members with claims arising prior to the date of settlement. The Court then expressed doubt that the proposal as presented could be said to be in the best interest of the class, since prior settlements before the Court had involved substantial payments of money. Plaintiff's counsel replied that if the Court were disposed to favor settlement, counsel would undertake a "thorough sifting of the discovery machinery," and take "a hard look" at defendant's records, so that plaintiff's counsel could assure the Court "in good faith that the defendant is in the way of having instituted effective affirmative action plans in all of its facilities."

Some time later, defendant's counsel replied to the implicit question whether any

monetary award or settlement fund was contemplated. It was disclosed that the sum of $15,000 would be disbursed, although the method of disbursal and the recipients of the money had not been discussed.[5] A reading of the October 27 "deposition," however, indicates the matter had been discussed, and that at least some implicit understanding had been reached.[6] On November 3 when the proposal was presented to the Court, plaintiff's counsel, according to Mr. Glenn's testimony at the December 15 hearing, had not been in contact with the named plaintiff for over four months. When defendant's counsel brought this point into focus, plaintiff's counsel stated that the settlement proposal was preliminary only, and was presented to the Court merely to see what the response would be.

The three motions herein treated were filed in December following abandonment of the settlement and plaintiff's counsel's admission that plaintiff had not been in touch with them for over six months. At the hearing on these motions December 15, counsel for defendant admitted the "motion to allow attorney's fees and costs" may have been premature, and would be better considered after a ruling on the motion to

---

**5.** These are defendant's counsel's statements at the November 3 hearing:

MR. ENTZ: . . . as far as the amount of money concerned, yes, there is going to be a payment of money and I assume that we could advise the court of that now as part of the settlement in the 23(e) decree that the sum of fifteen thousand dollars will be paid to the plaintiffs and the class.

THE COURT: But a disbursal of that money, where is it going to go? Will any of it go to the class?

MR. ENTZ: We have simply arrived at the figure. We have not discussed how it should be distributed at all. We don't know whether it would be all attributable to the attorneys fees or to the attorneys fees and the representative plaintiff or to any plaintiffs who come in and make a claim. We have not gotten that far. At least, our proposal to the plaintiff under 23(e) did not include a determination of that point.

**6.** On page 5 of the October 27 transcript appears the following statement by Fred Phelps, Jr.:

. . . I talked to [defendant's counsel] and I told him as far as the Plaintiff was concerned and Plaintiff's attorney, both locally and in a distant city, would agree or would accept the $15,000 attorney fee settlement and also the agreement to start working on settling this suit, including the Class Action part of it . . .

On page 18 appears the following comment by counsel for defendant:

I guess my concern was we talked settlement, the aspect of $15,000 attorney fees that were brought up earlier on the record. And then a significant part of the settlement is a consent to proceed that is a broad bar against any future or past sex discrimination cases that would be approved by the judge. And as I understand it last Saturday you called [counsel] and said that that dollar amount was acceptable. And I was just wondering if Pamela Sue Smith had accepted that or if that had been communicated to her.

MR. PHELPS, JR.: I am sure it was because I got the message to relay that message from my dad . . .

dismiss. We agree and will proceed first to the motion to dismiss, filed December 2.

In support of its motion to dismiss, defendant cites the complete failure to appear for depositions or answer interrogatories as evidence of plaintiff's lack of interest in the case, and asserts her claim should be dismissed for lack of prosecution. The asserted inability of plaintiff's counsel to locate plaintiff argues further in support of dismissal with prejudice. Clearly a case may be dismissed for a plaintiff's inexcusable failure to prosecute it diligently. *Food Basket, Inc. v. Albertson's Inc.,* 416 F.2d 937 (10th Cir. 1969).

We have no doubt that the events which have taken place in this case give defendant just cause for complaint. On the other hand, we must be mindful that the law favors the disposition of cases on their merits, and that dismissal is a harsh sanction which should be resorted to only in extreme cases. *Meeker v. Rizley,* 324 F.2d 269 (10th Cir. 1963). This is especially true in Title VII suits since the statutory scheme contemplates achievement of its goals through the largely informal efforts of laymen. *Kohn v. Royall, Koegel & Wells,* 59 F.R.D. 515 (S.D.N.Y.1973); *see Logan v. General Fireproofing Co.,* 521 F.2d 881 (4th Cir. 1971).

All in all, it appears dismissal for want of prosecution is a discretionary matter, and depends upon the degree of misconduct chargeable to plaintiff. *Compare Link v. Wabash R. R. Co.,* 370 U.S. 626, 82 S.Ct. 1386, 8 L.Ed.2d 734 (1962) *with Vina v. Hub Elec. Co.,* 480 F.2d 1139 (7th Cir. 1973). There is a split of opinion whether dismissal should be imposed in a situation clearly warranting it when the misconduct is solely chargeable to counsel. In upholding a dismissal for attorney misconduct in *Link, supra,* the Supreme Court stated:

. . . if an attorney's conduct falls substantially below what is reasonable

under the circumstances, the client's remedy is against the attorney in a suit for malpractice. But keeping [a] suit alive merely because plaintiff should not be penalized for the omissions of his own attorney would be visiting the sins of plaintiff's lawyer upon the *defendant*

. . .

*Id.* at 634 N. 10, 82 S.Ct. at 1390. However, the view has also been expressed that a dismissal with prejudice is too harsh a sanction when nothing in the record indicates plaintiff had any knowledge of, or participation in, derelictions of counsel; in such a case, sanctions should be directed to counsel. *Boazman v. Economics Laboratory, Inc.,* 537 F.2d 210 (5th Cir. 1976); *Pond v. Braniff Airways, Inc.,* 453 F.2d 347 (5th Cir. 1972); *Flaska v. Little River Marine Const. Co.,* 389 F.2d 885 (5th Cir. 1968). *See also, Link, supra* at 636 ff, 82 S.Ct. 1386. (Black, J., dissenting).

The situation before us is somewhat unique in that it appears to be a "classic case of a plaintiff's indifference," *Pacheco v. Phelps Dodge Refining Corp.,* 531 F.2d 709 (5th Cir. 1976), which would justify even dismissal of an employment discrimination suit with its strong flavor of public interest. Plaintiff appears to take so little interest in the case her own counsel claim they cannot locate her. However, the discovery problems of which defendant largely complains have become most exacerbated in the past six months, during which period the case has been kept in motion only by plaintiff's counsel. It is apparent plaintiff has known nothing of defendant's repeated attempts at discovery. Thus we will afford plaintiff one further chance to proceed with this litigation if she wishes to proceed with the matter *pro se* or through other retained counsel. While plaintiff has produced absolutely no evidence of the merits or even nature of her individual claim and defendant has offered to show the claim absolutely frivolous,[7] we will hold in abeyance our

7. Uncontroverted affidavits submitted by defendant over a year ago assert that plaintiff was employed by defendant for only 43 days, encompassing 30 working days, and was ab-

sent or tardy fully 15 of those days. She compiled seven unexcused absences and quit without notice. Defendant's personnel records indicate plaintiff "quit, babysitting problem, em-

ruling on the motion to dismiss plaintiff's individual claim for thirty days in order to afford plaintiff Smith one final chance to show cause why her claim should not be dismissed for lack of prosecution. We will direct that copies of this order be mailed to plaintiff's last known address; also, in the event plaintiff should contact anyone associated with this case, we trust she will be informed of the action today taken.

While we are loath to dismiss an individual claim before at least some limited inquiry into its merits, we have not the slightest doubt that plaintiff is not an adequate representative of the class sought to be represented in this case. It should go without saying that a representative plaintiff who cannot be located during the crucial stages of a class action lawsuit cannot effectively involve herself in the conduct of the litigation. However, our inquiry as to the propriety of class action status in this case cannot rest upon this point in light of the motion for intervention filed by a second purported class representative and defendant's claim that this case should not proceed as a class action irrespective of the identity or adequacy of the named plaintiff in light of the unusual action of plaintiff's attorneys to date. In essence it is claimed that since the requirement of Rule 23(a)(4), Federal Rules of Civil Procedure, that there be adequate representation of the interests of the class applies to counsel as well as the representative plaintiff, the conduct of this case so far should preclude Messrs. Phelps, Gelfond, Levin, and Glenn from acting as counsel for any class representative. Thus we proceed to examine the standards which must be met by class counsel, and to evaluate the actions of plaintiff's counsel in light of these standards.

The class action device is the recognized exception to the general principle of American law that no person is bound by a judgment to which he is not a party. *Johnson v. Shreveport Garment Co.,* 422 F.Supp. 526 (W.D.La.1976). Thus a court must be wary of allowing its judgment to bind absent members of a class when their interests are inadequately represented, *Hansberry v. Lee,* 311 U.S. 32, 61 S.Ct. 115, 85 L.Ed. 22 (1940). Since the 1966 amendments to Rule 23 eliminated the distinctions between true, hybrid and spurious class actions, and consequentially the "degrees" of *res judicata* effect accruing in each, the requirement of adequate representation has become more critical. If absent parties' interests are inadequately protected, an attempt to bind them by a judgment would "deprive them of their day in court," *Johnson, supra,* and lends the adequacy requirement a constitutional dimension as a due process requirement. *Nat'l Assn. of Regional Medical Programs v. Mathews,* 179 U.S.App.D.C. 154, 551 F.2d 340 (1976), *cert. den.* 431 U.S. 954, 97 S.Ct. 2674, 53 L.Ed. 270; *Gonzales v. Cassidy,* 474 F.2d 67 (5th Cir. 1973); *Johnson, supra.*

The most common formulation of the "standard of adequacy" is that of Judge Medina in *Eisen v. Carlisle & Jacquelin* ("Eisen II"), 391 F.2d 555 (2d Cir. 1968). With reference to the adequacy of the representative plaintiff's counsel, Judge Medina stated:

> To be sure, an essential concomitant of adequate representation is that the party's attorney be qualified, experienced and generally able to conduct the proposed litigation.

ployee stated that she was involved in auto accident and was advised by her attorney that she should not work." While we do not accept these records as completely dispositive of plaintiff's claim, we note that Messrs. Phelps and Glenn filed a lawsuit in the district court of Shawnee County, Kansas, alleging that plaintiff Smith was involved in a traffic accident May 15, 1975, twelve days before plaintiff terminated her employment with defendant. That case, No. 128,088, was settled April 3, 1976, immediately prior to plaintiff's "disappearance." These facts lend credence to the account given by defendant, and illuminates the following exchange between Mr. Phelps and Mr. Glenn at the December 2 "deposition" in the present case:

MR. PHELPS: We represented her in other matters—personal injury litigation—and she's always cooperated and been where we have told her to be, is that right?

MR. GLENN: That's right, and she received quite a bit of money from the other cases. I don't understand why in hell she doesn't cooperate now . . .

*Id.* at 562. While there must be an "active, interested, participating, named representative," *Lavin v. Chicago Bd. of Education,* 73 F.R.D. 438 (D.C.Ill.1977), the Court must also scrutinize the character, competence, and quality of counsel retained by the representative. *See, e. g., Oxendine v. Williams,* 509 F.2d 1405, 1407 (4th Cir. 1975); *Hermann v. Atlantic Richfield Co.,* 65 F.R.D. 585, 590 (W.D.Pa.1974); *Jeffrey v. Malcolm,* 353 F.Supp. 395, 397 (S.D.N.Y. 1973); *Brandt v. Owens-Illinois, Inc.,* 62 F.R.D. 160 (S.D.N.Y.1973). "Usually the degree of representation by the named party will be coextensive with the preparation and presentation of the named party's attorney." *Johnson, supra,* at 535.

■ In passing upon the adequacy of counsel, courts hold attorneys to a "heightened standard" in light of their great responsibility to the absent class. *Amos v. Board of Directors of City of Milwaukee,* 408 F.Supp. 765 (E.D.Wis.1976). The function of the court in this respect is unique in that it:

> . . . not only confers upon absent persons the status of litigants, but in addition it creates an attorney-client relationship between those persons and a lawyer or group of lawyers.

*Id.* at 774. The Court must satisfy itself representative counsel will act responsibly, for:

> One accepting employment as counsel in a class action does not become a class representative through simple operation of the private enterprise system. Rather, both the class determination and designation of counsel as class representative come through judicial determinations, and the attorney so benefited serves in something of a position of public trust. Consequently, he shares with the court the burden of protecting the class action device against public apprehensions . . . ."

*Alpine Pharmacy, Inc. v. Chas. Pfizer & Co., Inc.,* 481 F.2d 1045 (2d Cir. 1973), *cert. den.,* 414 U.S. 1092, 94 S.Ct. 722, 38 L.Ed.2d 549. Thus, "class action counsel possess in a very real sense, fiduciary obligations to those not before the court," *Greenfield v. Villager Industries, Inc.,* 483 F.2d 824, 832 (3d Cir. 1973); *Holland v. Goodyear Tire & Rubber Co., 75* F.R.D. 743 (N.D.Ohio 1975), and the court has a concomitant duty to ensure these obligations are met.

■ Plaintiff's counsel has addressed the question of "attorney adequacy" in the class action brief filed in this case by submitting a voluminous list of class actions counsel is prosecuting. While the list is certainly both impressive and outdated, see note 11 *infra,* we disagree with the implicit assertion that sheer volume demonstrates adequacy. The requirement of adequate representation is qualitative and not quantitative. *Simon v. Westinghouse Elec. Corp.,* 73 F.R.D. 480 (E.D.Pa.1977); *Clark v. Cameron-Brown Co.,* 72 F.R.D. 48 (M.D.N.C.1976). The most revealing indication of the protection class counsel would afford absent class members is the conduct of the named plaintiff's case to date. *Brandt, supra.* Also, in keeping with the "heightened standard of adequacy" which comes into play when an action is certified as a class action, it is also proper to consider the resources and the other demanding obligations of class counsel. An attorney or attorneys who have shown the utmost competence in conducting traditional, binary litigation may simply lack the time and ability to prosecute a class action satisfactorily. *Amos, supra,* at 774.

With this in mind, we proceed to examine the conduct of plaintiff's counsel in this case. Messrs. Phelps, Levin and Gelfond signed the various initial pleadings which caused so much confusion as to the class asserted to be represented by plaintiff. These problems have been detailed in note 2, *supra,* and accompanying text. We note also that the statutes charged in the complaint range from the proper, to the questionable, to the absurd in light of the type of discrimination alleged. After the Court eliminated these statutes from the complaint, and Mr. Phelps filed an amended complaint reflecting this change, a motion was filed by Mr. Phelps stating that the case was proceeding under one of the dismissed counts. Even now the proposed

complaint in intervention filed by Fred Phelps, Jr. on behalf of Arline Earley recites a similar litany of statutory authority.[8]

We believe the problems outlined above and encountered in other cases filed by Mr. Phelps, Mr. Phelps, Jr., Mr. Levin and Mr. Gelfond can be traced directly to the "production-line" procedure these counsel evidently follow in filing and managing class action cases. While the myriad class actions filed by these attorneys before this Court[9] share certain characteristics traceable to the intracticability (or perhaps work overload) of counsel,[10] the most spectacular similarities can be found in the pleadings filed in these cases, and the motions that follow as a matter of course.

We have warned plaintiff's counsel in the past that:

. . . an attorney filing a complaint alleging the existence of a class of persons entitled to relief has a professional responsibility before signing and filing that complaint to determine that there is

a sufficient evidentiary basis to support the class action allegations. While it may sometimes be necessary to indulge in discovery to prepare these materials in evidentiary form the amount of such discovery should be limited to this purpose. . . . [Discovery] time . . . should not be used by the plaintiff's counsel to engage in a fishing expedition to determine whether or not there is any factual support for his allegations . .

*Barnett v. Laborer's International Union,* 75 F.R.D. 544, 545 (W.D.Pa.1977). However, time and again plaintiff's counsel has filed, and continues to file, "stock" briefs and motions which make little, if any reference to any individual case.

For example, scrutiny of the briefs and motions for class determination filed by plaintiff's counsel in various Title VII class action cases pending before this Court reveals that a single, "universal" brief is filed in all of them, and that the motion varies little from case to case.[11] Further, it is

---

**8.** The proposed complaint in intervention recites that it arises under 42 U.S.C. §§ 1981, 1983, 1985, 2000d, and 2000e *et seq.* The applicant for intervention or joinder is a white woman alleging sex discrimination. On October 18, 1976, this court entered an order in another Title VII class action case brought by present plaintiff's counsel detailing why 42 U.S.C. § 1981 does not apply to a sex discrimination case; why 42 U.S.C. § 1983 cannot apply in a suit against a private employer absent allegations of significant state involvement; why there must be valid allegations of conspiracy in order to state a claim under 42 U.S.C. § 1985; and why 42 U.S.C. § 2000d is inapplicable to a case of this nature. That order was incorporated by reference in the present case on January 28, 1977.

**9.** Although the court's filing system is not tailored for recall of all cases of a certain type or filed by certain counsel, casual inspection has unearthed twenty-seven Title VII class actions filed by Fred Phelps, Chartered, and affiliates in *this* district, before *this* division, in the past two years. Most of these are listed in note 11 *infra.*

**10.** As we said in our order of October 20, 1977, in *Lang v. Hallmark Cards, Inc.,* No. 76–99--C5: Plaintiff's attorneys demonstrate a great propensity for filing class action suits in this court . . . [m]any of them have been pending for well over a year, on the question

of class certification alone, and all share the feature of protracted discovery fights [necessitating] . . . intensive court involvement on a regular basis.

And from our order of June 29, 1977, in *Ivy v. Boeing,* No. 76–64–C5:

The court would observe that the conduct of plaintiff's attorney in pursuing discovery appears to have been from a myopic viewpoint. His discovery efforts have been restricted to furthering the theory of plaintiff's development of the class and case without full recognition that the defendant has an equal right to pursue discovery . . . plaintiff's attorney has tended to honor only his view of his obligations under the various orders . .

**11.** Having noted time and again the useless redundancy of the motions for class certification and the briefs filed in support thereof, the court has reviewed some of the class actions filed by plaintiff's counsel and the relevant documents therein. All dates given below in connection with case captions are the dates of filing of the class motion and brief.

The earliest Title VII class action case filed with this court by plaintiff's counsel appears to have been *Steele v. City of Topeka,* No. 75–203–C5. The brief in support of class certification is a 25-page document organized around six subheadings. It is signed by Mr. Fred W. Phelps and co-counsel, two attorneys from a

Pennsylvania firm entirely different from the Philadelphia co-counsel involved in the present case. The motion for class certification is a simple, one-sentence affair submitted separately. Both were filed February 17, 1976.

On April 26, 1976, six Title VII cases were filed with this court by plaintiff's present counsel, Mr. Phelps, in association with Messrs. Levin and Gelfond from Philadelphia. The nearly identical complaints in all six cases indicate that they will be prosecuted as class actions; indeed, even the EEOC charges appear to have been form documents. Motions for class action and supporting briefs were filed in all six cases on June 16, 1976. The cases are:

No. 76–64–C5, *Ivy v. The Boeing Co.*

No. 76–65–C5, *Davis v. St. Francis Hospital*

No. 76–66–C5, *Smith v. Stormont-Vail Hospital*

No. 76–67–C5, *Smith v. Jostens* (the present case)

No. 76–68–C5, *Peals v. Southwestern Bell*

No. 76–69–C5, *Brown v. Frito-Lay*

The identity of many of the documents filed in all six cases, and the confusion arising therefrom, can perhaps never be adequately documented. However, with reference only to the motion and brief on the class action question, we note that the motions in all six cases were of the "fill-in-the-blank" type. The motions themselves alleged in conclusory fashion that all the prerequisites of Rule 23 are met in the case. The supporting briefs, while obviously identical to each other, are also identical to the brief filed in *Steele v. City of Topeka, supra,* with these minor changes: citations to 1975 cases which were left blank in the *Steele* brief are completed; a long quotation from a 1976 case is added; and allegations as to the number of persons in the class are deleted, and a blank is left at this point in the brief.

On November 1, 1976, a motion and brief were filed in the case of *Lang v. Hallmark Cards,* No. 76–99–C5. Both the motion and brief are textually identical in all respects to those filed in the sextet of June 16, although both have been retyped and the blanks which did not fit the names and dates inserted in the June 16 documents are thus obviated.

The next class motion and brief the court has unearthed was filed June 15, 1977, in the case of *Judie v. Sherwood Construction Co.,* No. 77–4007. The motion for class certification is textually identical to that filed in the 1976 cases save for the change in the plaintiff's name and other identifying particulars. However, the brief has been "streamlined;" whereas the briefs filed in the cases listed above filled approximately twenty pages, the count is now down to ten.

Nevertheless, the changes offer little to aid the court. The *Judie* brief drops the introductory list of statutes sued under and refers only to "those federal laws referred to in the foregoing motion." Repetition of the nature of the EEOC charge is dropped, and the reference to the plaintiff's affidavit as to the approximate size of the class is deleted (this reference was contained in all eight cases listed above, although only in *Steele* was such an affidavit filed to our knowledge). The subheads remain the same throughout the brief, and the following material is deleted:

A paragraph to the effect that the right to maintain a class action does not depend on the existence of a cause of action;

A list by circuit of cases holding that class action allegations should be liberally construed;

A page of cases from other circuits indicating the number of class members which were held to satisfy the numerosity requirement;

Two pages of quotations from Fourth, Fifth, and Seventh Circuit cases;

Four pages of case citations and quotations on the commonality requirement (replaced with a half-page summary citing one Fifth Circuit case and one state case, with no mention of "typicality" as. such, although the heading purports to cover it as well);

Six case citations dealing with the "adequacy" standard (none had been more recent than 1972 anyhow);

The offer to supply a list of class actions brought by plaintiff's counsel; and

Another page of long quotations and citations.

The only addition to the original brief filed in *Steele* is that of one 1977 case and a paragraph about its holding. One introductory reference to a 1975 case is changed from "last year" to "lately."

Five days later, June 20, 1977, motions and briefs for class action determination were filed by plaintiff's counsel in four more cases: *Amirault v. Fleming Foods Co.,* No. 77–4036; *Campbell v. Boeing,* No. 77–4053; *Linton v. KNI,* No. 77–4068; and *Cordero v. Southwestern Bell,* No. 77–4070. In these cases the class action motion, while basically the same as those mentioned above, drops all reference to the individual plaintiff's name, referring only to the "above-named" in the caption. The brief also drops reference to individual names ("the named representative plaintiff"), and space is left in the text for a universal gender designation (this fact shows most prominently in the brief filed in *Johnson v. Wentz Mfg. Co.,* No. 76–54–C5, motion filed Aug. 18, 1977: "plaintiff has commenced an action for h self and all others similarly situated.") Also in the brief, citations to some cases are deleted in favor of "supra." Under the heading dealing with commonality and adequacy, a paragraph alleging typicality in conclusory fashion which formerly contained the name of the representative plaintiff is dropped. In *Amirault, supra,* the words "female" and "sex" are substituted in mis-sized blanks obviously intended for "black" and "race;" the "er" in "herself" is slightly misaligned. In *Campbell,* both sex dis-

generally true that these "form" documents are the only filings of any moment in the case.[12] It has been our experience time and again that at the time for class action hear-

ing before the Court, the purported class has been inadequately represented in that plaintiff's brief filed by present counsel makes no attempt to apply the facts of the

crimination and race discrimination are alleged, so reference to "sex" and "female" are interlineated or typed in the margins. In *Linton,* instead of interlineations, every time "black" or "race" appears an asterisk refers to a footnote which assures us that "female" or "sex" is meant as well. In *Cordero,* plaintiff is a Spanish-surnamed American alleging discrimination on the basis of national origin, so where the motion and brief would ordinarily read "race" or "sex" there is inserted the word "minority," or if the space is too short, "m'rity."

Substantially the same brief was filed in *Vaughn v. City of Topeka,* No. 76–141–C5 (brief and motion filed August 8, 1977); *Johnson v. Wentz, supra; Davis v. Teamsters,* No. 77–4134 (August 19, 1977); and *Newman v. Goodyear,* No. 77–4135 (September 12, 1977). However, by the time of the filings in *Contee v. St. Francis Hospital,* No. 77–4051 (September 26, 1977), further emendation had taken place, and portions of the brief dealing with the four criteria of Rule 23(a) had been pared thus:

Under the heading dealing with "numerosity," nothing is added, but all of the prior text is dropped save for a single sentence. This change deletes the former reference to the nature of the class and hence the necessity to type in "black" or "female."

Under the heading dealing with "commonality and typicality," there remains only a single sentence culled from prior versions of the brief which says the commonality requirement is to be liberally construed. Three state cases are cited for this proposition.

Under the "adequacy" heading only a single quotation and its introductory paragraph remains. One citation, to a state case, is added.

The final paragraph of the "conclusion" is deleted.

The *Contee* version of the brief and motion encompasses eight pages. This version has been employed in the most recent filings, *Walters v. City of Wichita,* No. 77–4131 (September 28, 1977); *Lane v. City of Wichita,* No. 77–4125 (October 7, 1977); *Reed v. City of Wichita,* No. 77–4136 (October 13, 1977); *Thompson v. City of Wichita,* No. 77–4126 (October 20, 1977); and *Lewis v. City of Wichita,* No. 77–4124 (October 20, 1977). Although these last five evidence a retyping of the basic brief and motion (with a consequent shortening to 7 pages), they are faithful reproductions of the text of the brief and motion in *Contee.* The citation to *Horn v. Associated Wholesale Grocers,* remains blank although the case was printed as 555 F.2d 270 in the advance sheet dated July 18, 1977; the same is true of state cases long since published.

The foregoing account, while revealing enough in itself, is by no means an example of exhaustive textual research. The cases listed are only those filed by plaintiff's counsel before this court, in this division of this district, in which we are aware of class action motions and briefs having been filed. As can be seen, there has been a steady evolution of the source, the brief in *Steele,* toward a brief of universal application in both state and federal courts (we do not know how many class actions plaintiff's counsel has filed in state court, but the presence of state court actions in the "list" of Dec. 30, 1976, see n. 4 *supra,* and accompanying text, and the presence of state case citations in the brief, indicates a universal design). Nor do we know what has been filed before other federal courts of this district, or of other districts. Likewise we have not undertaken a review of the similarities between the complaints, motions to intervene, attorney-prepared EEOC charges, and the like filed in these cases, although from long experience we are certain these also are form documents. For example, the complaints in *Davis,* No. 77–4134 *supra, Newman,* No. 77–4135 *supra, Reed,* No. 77–4136 *supra,* and *Davis v. Santa Fe,* No. 77–4137 (class action motion not yet filed) were all filed July 7, 1977, and are absolutely identical in all particulars save for the inserted names and addresses of plaintiff and defendant. This has occasioned some confusion in No. 77–4134, for the defendant labor union is alleged to be an "employer" and the alleged acts committed and relief prayed for are wholly inappropriate. The EEOC charges in this and other cases follows closely the form set forth in notes 1 and 23 of this opinion. Had we the time and resources we believe a pattern analogous to that followed in the class motions and briefs could be easily discerned in all cases listed in this note.

**12.** For example, in the instant case, when a more original or individually-tailored filing became necessary, those filed by plaintiff's counsel were marvels of brevity and simplicity. For example, the memorandum attached to the motion to compel filed June 27, 1977, consists of three sentences which recite in effect "we asked; we're entitled; they didn't give." Between June 16, 1976 (the date the motion for class action was filed) and September of 1977, plaintiff filed seven motions or responses to motions, which must be accompanied by supporting memoranda according to local rule. Most of the memoranda recite dates and facts; only one cites cases (three, two of which are cited to show the proper statute of limitations for a statute not pleaded in the amended complaint).

case to the law of Rule 23. Although counsel's discovery is inevitably time-consuming it does not seem to result in anything of value to the Court.[13] On the other hand, defendants in these cases, rather than file form briefs, make an earnest attempt to apply the facts of the particular case to the applicable law. It follows, then, that plaintiff's counsel's brief is inherently less persuasive and of virtually no assistance to the Court.

The situation before us is directly parallel to that in *Taub v. Glickman,* 14 F.R.Serv.2d 847 (S.D.N.Y.1970). In that case the court refused to certify a class on the ground of inadequate representation because, *inter alia,* the plaintiffs employed "stock" pleadings:

> [T]he moving memorandum of law submitted by plaintiffs in this and numerous other Rule 23 motions in this court is merely a "boiler plate" document prepared without regard to the specific factual situations existing in each case. Moreover, the interrogatories served in this and other similar actions consist merely of mimeographed "stock questions" with a freshly typed caption, which attempt to make no factual distinction between each class action in which it is employed. Such an assembly line procedure in prosecuting this suit suggests that something less than a forthright and vigorous approach has been taken herein.

Plaintiff's counsel do not give these cases the intensive, individualized attention necessary to protect the rights of absent class members. While an individual plaintiff may be bound by the acts or omissions of his attorney, the Court has a duty to see that absent parties' interests are carefully and painstakingly protected. We cannot countenance the representation of an absent class in the manner shown in this and other cases filed by plaintiff's counsel.

Nor do we believe plaintiff's counsel has the resources to handle the large number of class action suits they file with alacrity. Fred Phelps, Chartered, local counsel of record in all the class action cases listed in note 11, *supra,* consists of three attorneys. Two of these have only recently associated themselves with the firm.[14] The firm is clearly a "family business" which handles a great volume of other litigation in addition to a myriad of class actions. The firm has repeatedly moved this Court for extensions of time in various cases, citing "heavy litigation commitments." While other attorneys before this Court make such requests from time to time, none of them has undertaken to represent the interests of thousands of absent parties. Philadelphia counsel, Gelfond and Levin, signed initial pleadings in the instant case and apparently took one deposition, but have never appeared in this court. At the December hearing on the motions before us it was stated that they are "legal advisors on class action legal issues" who "specialize in class actions and have several attorneys working on that—it's their line of work." Yet the impact of these "specialists" has been negligible in the present case. The motion for class determination and supporting brief, certainly two of the most crucial documents filed in

13. In the case before us, neither the defendant nor the court has been able to ascertain anything of plaintiff's individual claim, or even whether plaintiff remains alive, since the filing of this suit in April of 1976. Likewise, nothing plaintiff's counsel may have unearthed in the discovery process has been imparted to the court. The hearings on class certification in these cases have featured last-minute subpoenas and even a motion, after one hearing, to reconsider the court's refusal to allow plaintiff's counsel to depose an officer of the defendant corporation, when the "deponent" was subpoenaed by plaintiff's counsel, present in the courtroom all day, and never called to the stand!

14. On page 18 of the October 27 transcript appears the following statement by Fred Phelps, Jr.:

> In the first place I was working with the Kansas Court of Appeals until just last month, so I haven't been working on any of the cases around here. No, I personally haven't been working on this case. I am just here today because no one else is . . .

The third member of the firm is the wife of Mr. Phelps, Jr. She has not appeared in this class action, or any other to our knowledge.

any purported class action are direct descendants of those filed by Fred Phelps, Chartered, and a different Pennsylvania firm in an earlier case.[15] The conduct of this action after Mr. Phelps moved to withdraw is further evidence that they take no active part in the conduct of litigation in this district.[16] Mr. Glenn's appearance on plaintiff's behalf December 2 came as a surprise to defendants and the Court alike, and at the hearing on the motions before us he repeatedly disavowed having anything to do with the conduct of the case. It is obvious to the Court that this and the many other class actions noted above are principally conducted by Fred Phelps, Chartered. The pleading problems noted herein and the difficulties encountered in the case before us raise a question as to the adequacy of the firm to handle the collective workload of class actions it has filed. *Amos, supra* at 774.

We now turn to another troublesome aspect of the handling of this case, the settlement proposal presented to this Court November 3 and outlined at pages 159 and 160 *supra*. Plaintiff's counsel now asserts the proposal was merely tentative, a "feeler" to the Court. Yet in one sense all proposals of settlement in class cases are tentative in that they must be so presented; a class action cannot be dismissed or compromised without the approval of the Court. Rule 23(e); Federal Rules of Civil Procedure.

The purpose of court scrutiny of proposed settlements is chiefly to protect nonparty members of the class from unfair or unjust settlements affecting their rights. The character of the Court's inquiry should not be altered by the fact that a class has not yet been certified, since pending certification class status must be presumed. *Je Maintiendrai Club v. Trans International Airlines,* No. 76–2066 (10th Cir., 9/21/77, unpublished), *citing Pearson v. Ecological Science Corp.,* 522 F.2d 171, 176–77 (5th Cir. 1975); *Kahan v. Rosetiel,* 424 F.2d 161, 169 (3rd Cir.), *cert. denied,* 398 U.S. 950, 90 S.Ct. 1870, 26 L.Ed.2d 290 (1970); *Duncan v. Goodyear Tire & Rubber Co.,* 66 F.R.D. 615, 616 (E.D.Wis.1975); *Rotzenburg v. Neenah Joint School District,* 64 F.R.D. 181, 182 (E.D.Wis.1974); *Held v. Missouri Pacific Railroad Co.,* 64 F.R.D. 346, 347 (S.D.Tex. 1974); *Muntz v. Ohio Screw Prod.,* 61 F.R.D. 396, 398 (N.D.Ohio 1973); *Philadelphia Elec. Co. v. Anaconda American Brass Co.,* 42 F.R.D. 324, 326 (E.D.Pa.1967). Thus a court must find the proposed disposition of the case in the interest of the whole class, *Euresti v. Stenner,* 458 F.2d 1115 (10th Cir. 1972), since the court must function as "guardian of [the] absent parties." *Amalgamated Meat Cutters v. Safeway Stores, Inc.,* 52 F.R.D. 373 (D.Kan.1971); *see* 7A Wright & Miller, Federal Practice & Procedure, Civil, § 1797. The proposal must be "fair, reasonable, and adequate." *Seiffer v. Topsy's International, Inc.,* 70 F.R.D. 622, 627 (D.Kan.1976).

In addition to the protection of absent class members, court review of proposed settlements may alert the Court to abuses of the class action device. The classic example of such abuse is the use by a plaintiff and his attorney of class action allegations as a "bargaining chip" to produce settlement offers which would be unwarranted by the individual claims of the representative plaintiff:

In the pre-certification context, the settlement problem will often arise in the

---

15. See note 11, *supra.* Members of the other Pennsylvania firm have appeared in this district in the two class actions in which they are co-counsel and have shown themselves competent and qualified.

16. The December 1 "deposition" goes into some detail concerning the withdrawal as counsel by Mr. Phelps, and the failure to withdraw by Gelfond and Levin, culminating with the following exchange:

MR. PHELPS: You knew Mr. Gelfond was co-counsel with me.

MR. ENTZ: That's correct.

MR. PHELPS: And you reasonably knew that when I sought leave to withdraw, that they were not going to continue as counsel in Kansas.

MR. ENTZ: It didn't indicate that at all in the motion.

MR. PHELPS: You reasonably knew it, though.

form of a motion to dismiss class allegations or to dismiss the action altogether. Either of these motions may follow a legitimate decision that a claim is atypical or meritless, but they may also be the culmination of a process in which the representative plaintiff increases his bargaining leverage by filing a class suit and then attempts to abandon the class when his personal objectives have been met. Such a use of the class action may properly be called an abuse because none of the policies underlying the creation of the device are advanced.

Note, Developments in the Law—Class Actions, 89 Harv.L.Rev. 1318, 1540 (1976). Thus, a plaintiff who intends to represent himself in preference to the class may be "bought off" by a defendant who will settle plaintiff's individual action for more than it is worth in order to avoid the expense of class action defense and potential class recovery. Plaintiff's counsel may thereby "trade off a smaller total award payment by the defendant for a larger fee," Rosenfield, An Empirical Test of Class-Action Settlement, 5 J. Legal Studies 113, 116 (1976), or in the case of an impecunious plaintiff with a meritless claim, collect a fee where none would otherwise accrue.

It has been said that close attention to notice requirements and scrutiny of the reasonableness of class counsel's legal fees will curb abuses of the class action procedure. *Magana v. Platzer Shipyard, Inc.,* 74 F.R.D. 61, 72 (D.Tex.1977). We have expressed our doubt that mere policing of attorney fees will prevent abuse when class action allegations are merely added to a complaint for coercive value, to escalate the potential costs of defense at little expense of time, money, or inconvenience to the plaintiff. See our order in *Johnson v. Wentz Equip. Co.,* No. 76–54–C5 (D.Kan., 12/22/77). This is particularly true when the documents alleging class status are "boiler plate" and filed in a large number of cases; individual plaintiffs may have their "bargaining power" thereby increased, and class counsel may be able to charge apparently reasonable fees relying on the sheer volume of spurious class cases to reap benefits from the abusive practice.

We proceed to inspect the settlement proposal set before us November 3. It was suggested the Court certify a class of thousands of persons, and adjudicate all claims of such persons conclusively. The evident concern that the settlement should have binding effect on all class members is reflected in the proposal that the Court find specifically that all absent class members had been accorded due process. On the other hand, there was an evident concern that the "due process" thus dispensed would be inexpensive and perfunctory; notice would be posted and published, or perhaps merely posted by defendant (we note here that the proposed class included persons terminated or refused employment, whom we presume do not visit defendant's plants on a regular basis). The period for objection to the proposed settlement was to be "short."

The proposal to eradicate the possible claims of thousands of class members with such dispatch is sufficiently questionable that this Court would not countenance such a procedure. Perhaps this was sensed by the parties, for after the Court suggested the parties return with a more detailed written plan the matter was dropped.[17] Regardless of the tentative nature of the proposal, the fact remains that it had sufficiently "jelled" that counsel thought it worthy of presentation to the Court. The sole "relief" clearly directed to the class would

---

17. The court was notified that the settlement negotiations had been terminated in a letter from defendant's counsel dated November 29, 1977. The letter recites the defendant's discovery that the terms of settlement suggested November 3 would be subject to collateral attack and that more extensive notice than contemplated in the settlement proposition might be necessary. Although as we have commented, defendant's concern for the propriety of the settlement provisions was doubtless motivated by self-interest, we note that plaintiff's counsel never expressed such doubts and never informed the court of their views after the November 3 hearing. Nothing before the court to date indicates that the decision to terminate settlement negotiations was anything but the unilateral decision of the defendant.

be the "reiteration" of defendant's affirmative action plan. Whether defendant was acting to comply with that plan apparently was to be decided by plaintiff's counsel, who had been acting at that point for over four months without the benefit of any communication with the plaintiff. While there were hints that some part of the $15,000 "fund" might inure to the benefit of the class, we note that there were stronger hints that the money would go exclusively to counsel, see note 6 *supra*. The perfunctory notice provisions and short objection period suggested in the proposal strongly suggests that any sharing in the recovery by class members would be at best an ingenious exercise in the conceivable. In any event, there were more members in the class than dollars in the award. Since the plaintiff had "disappeared" long before, it appears that the money would have to be disbursed in the sole discretion of plaintiff's counsel. We find it unlikely that a settlement proposal counsel now characterizes as rough and tentative had its roots in a discussion between counsel and plaintiff over four months before, and the October 27 transcript contains the assertion that plaintiff and her counsel had accepted the settlement offer only on the preceding Saturday.[18] While plaintiff's counsel evinced a willingness to comb the discovery records to assure the Court defendant had mended its ways, the motivation to so assure the Court would certainly be strong since counsel would stand to profit so handsomely thereby; and defendant made it quite clear that its offer was conditioned upon perfunctory notice to potential claimants.

■ Seen in light of plaintiff's long absence from involvement with the case, we believe the proposal shown the Court was plainly unusual and one-sided, and its approval would have resulted in great prejudice to absent class members, and perhaps to the absent plaintiff, at a profit to counsel and counsel alone.[19] While discovery was being scheduled, while settlement negotiations took place and the proposal was presented to the Court, in short while every outward indication was being given that the case was proceeding in normal fashion,[20]

18. The following colloquy begins on page 4 of the October 27 transcript:
MR. PHELPS, JR.: · Okay. Now let me state first of all that on Saturday, last Saturday, and I don't have a calendar, I think it would have been about the 22nd or so of October. Is that when I called you?
MR. ENTZ: Saturday morning, yes. ·
MR. PHELPS, JR.: Okay. And I talked to Mr. Entz and told him as far as the Plaintiff was concerned and plaintiff's attorney, both locally and in a distant city, would agree or would accept the $15,000 attorney fee settlement
· · ·

19. We are in full agreement with the suggestion of the Manual for Complex Litigation, § 1.61, that no settlement should be approved without full disclosure of the settlement details, including the amount and allocation of attorney fees and other expenses. The present case illustrates the wisdom of such a practice.

20. The October 27 transcript is quite instructive in this regard. Defendant repeatedly expressed concern that the plaintiff had not been notified of the deposition settings for which defendant's corporate counsel had flown in from Minnesota. The conversation begins on page 8:
MR. ENTZ: Could you tell me who would know for sure and where she [plaintiff] was contacted and when?

MR. PHELPS, JR.: Yes, I can; my father would know for sure.
From page 9:
MR. FISHER: Well, then, did you receive from this office as to how she was contacted and if she was contacted between Saturday and Monday, from the time that apparently the deposition was in doubt?
MR. PHELPS, JR.: That is not clear. I said I didn't have personal knowledge of that. And I also would submit at this time it is not relevant. But I think it has to set at that. I don't know of anyone here that would have personal knowledge as to whether she was contacted Saturday.
MR. ENTZ: You are saying you don't have anyone here now?
MR. PHELPS, JR.: No. I heard she was contacted; it is hearsay.
MR. ENTZ: How can we find out who contacted her, if anyone has?
MR. PHELPS, JR.: My father, I already said that. And I maybe could get him on the phone.
Mr. Phelps, Sr., was then contacted by speaker phone:
MR. ENTZ: Sorry to bother you, but I had a request in regard to whether or not Pamela Sue has been contacted Saturday, and if so where the contact was made so we can try and find her.

this case was being conducted without consultation with the plaintiff. The evidence also suggests that counsel was willing to forfeit the claim of the named plaintiff, as well as the potential claims of thousands of class members nationwide, in return for a "fee" plainly excessive under the circumstances.[21] The fact that this did not happen, and counsel's plea that the settlement proposal was merely tentative, is certainly a fortuitous circumstance but does not assuage our suspicions. Even if no improprieties which resulted in actual damage to absent parties resulted, the appearance of impropriety certainly permeates this case.

 We believe the conduct of plaintiff's counsel in this case falls below the standard which should be met by counsel attempting to represent a class of potential claimants and whose conduct may bind those class members in a judgment. Based upon this finding, we accordingly hold that the firm of Fred Phelps, Chartered, singly or in association with other counsel appearing herein, is inadequate as a representative of the interests of the asserted class sought to be certified in this case, the members of which have no effective control over the disposition of their interests.

We emphasize that we do not pass upon the ethical propriety of the actions of plaintiff's counsel in this case, and we do not intend this order to reflect adversely upon the able representation afforded class clients by the Pittsburgh, Pennsylvania firm referred to in note 15 *supra.* We merely state that class counsel must be held to a very high standard of conduct and performance, and plaintiff's counsel in this

\* \* \* \* \* \*

MR. ENTZ: Okay. I guess the one thing I wanted to clarify, Fred, was that once the court ordered the deposition of Pamela Sue she has never been contacted to tell her that the deposition was on.

MR. PHELPS, SR.: Well, I thought that she had, Stu. Is there somebody that said otherwise?

MR. ENTZ: No one has said that she has been.

MR. PHELPS, SR.: That she has been?

MR. ENTZ: That she has been. No one has said that.

MR. PHELPS, JR.: What has been said was I didn't have personal knowledge whether she had been, and I thought maybe you did. And that was one of the reasons they wanted to talk to you. Can you hear me?

MR. PHELPS, SR.: Yes, I can hear you. No, it is my understanding that she has and she was going to be here, except that when you said it was cancelled.

MR. ENTZ: That is my concern, Fred, and maybe that is what we are trying to hang our hats on. But she didn't even know it had been cancelled and that she had never been contacted for the deposition. And I am trying to figure out if someone had told her "We had a conversation with Entz. It has been cancelled. You don't have to be here Thursday."

MR. PHELPS, SR.: That is exactly what happened.

As we noted in the text at page 7, it was asserted at the hearing that Mr. Phelps got this information from Mr. Glenn, his "contact" with plaintiff, who testified that he had been called while absent from his office by a "Pam Smith" who turned out not to be the plaintiff. How such a contact can be mistaken for an affirmative communication *to* the plaintiff that a deposition is, or is not scheduled, remains a curious question. At the December 15 hearing Mr. Glenn, in response to inquiry by the court, promised to supply the court with details as to the identity of the "other Pam Smith." Mr. Glenn has filed a document in which a Mr. Willard G. Harris states he contacted a Pamela Smith and advised her to contact Mr. Glenn. The affidavit concludes, "I used every method based upon my —— years of experience and I was not able to locate the whereabouts of Pamela Sue Smith." Mr. Harris does not supply even approximate dates of these endeavors. The investigator who appeared at the October 27 meeting and spoke of his fruitless efforts to contact plaintiff was a Mr. Hiett.

21. As we have noted, all documents of substance filed were not individually prepared for the case. Plaintiff's disappearance made it highly unlikely that the case could be maintained. Defendant's contentions concerning the individual claim (see note 7, *supra*), if accurate, would certainly cast doubt upon plaintiff's ability to represent a class even should she reappear. In another Title VII class action case brought by plaintiff's counsel, *Johnson v. Wentz Equip. Co.*, text at p. 27, we approved a fee of less than four per cent of the amount that was to be paid by the present defendant. The probability and strong indication that the settlement agreement contemplated that plaintiff's counsel was to receive most, if not all, of the money paid by defendant in this case hints at "a lack of professional self-restraint in matters of compensation," *In re Phelps*, 204 Kan. 16, 25, 459 P.2d 172, 178 (1969).

case have demonstrated an inability to meet this standard.

It is little consolation that the Court may be able to police and correct problems with class counsel's representation, and adjust its perceptions accordingly, for this can only be effective when the Court's attention is invited to such matters. Some courts' custom of tolerance for questionable practices and concerns for expediency may persuade a defendant not to raise such matters until the situation becomes absolutely intolerable. Likewise it is little consolation that an absent class member may later be able to demonstrate he was not accorded due process and fair representation, and thereby to convince a court to entertain his claim irrespective of a *res judicata* defense. The class action device exists to forestall duplicative litigation through the economical and expeditious adjudication of a great number of similar claims in a single case. Abusive practices or negligent conduct which result in insufficient regard for the rights of absent claimants result in a perversion of this purpose.

We have before us the application of Arline Earley to be allowed to intervene or join as a party plaintiff in this case. Ms. Earley is represented by Fred W. Phelps, Chartered. She wishes to intervene, *inter alia,* "for the purposes of saving the rights and interests of the class." An attached memorandum incorporates an advance-sheet summary of two cases, *Milonas v. Amerada Hess Corporation,* D.C., 382 F.Supp. 415, and *Castoe v. Amerada Hess Corporation,* No. 74 Cv. 3978, decided by Judge Cannella of the Southern District of New York on November 4, 1977. In these cases it was held that a voluntary withdrawal of original class representatives should not preclude intervention of a new class representative to protect class interests.

Rule 23(d) specifically contemplates intervention in class suits, especially by persons properly members of the class who are no longer adequately represented by existing parties. *See, e. g., Gaddis v. Wyman,* 304 F.Supp. 713 (S.D.N.Y.1969). Were Ms. Ear-

ley an applicant in such a posture, and were we convinced the present case could continue to a fair resolution under her guidance, we would not hesitate to expedite her intervention. However, the identity of her counsel and the circumstances surrounding her appearance, see note 23 *infra,* lead us to believe this case should not continue as a class action. We have already outlined our dissatisfaction with the representation provided by Ms. Earley's counsel in this case. The circumstances of the present motion filed on her behalf recall the situation in *National Auto Brokers Corp. v. General Motors Corp.,* 60 F.R.D. 476 (S.D.N.Y.1973):

> [N]either [applicant for intervention] should be permitted to represent classes or subclasses in this action. Their proposed entry into the action indicates strongly that they were brought in by [plaintiff] and its attorneys as an artificial device to keep the class action going, after it became apparent that [plaintiff] was likely to fail as a representative.

> The move to have [applicants] intervene came only after [defendant] had filed its motion to deny class action treatment, and had pointed out [the faults in plaintiff's claims].

> At this juncture, intervenors were sought who would not have [plaintiff's] infirmities.

*Id.* at 487. The court went on to detail the close connections between plaintiff's attorneys and the applicants for intervention, whom we presume had secured different representation.

In the present case, when it became apparent plaintiff would not be an adequate class representative and negotiations to settle the case fell through, Fred Phelps, Chartered moved to withdraw as counsel for plaintiff. We now understand that it was their intention, and remains so, to continue as counsel for the class. The plaintiff would have been left without counsel from and after November 22, the date of the original motion to withdraw, and the evident intent was that the class should be represented by the firm alone until December 6, the date the motion to intervene or

join was filed, and thereafter until a ruling was made on the motion. Such a situation could not, and cannot, be tolerated. Courts have held that there is an irreconcilable conflict of interest when the roles of counsel and representative plaintiff become entangled. *Clark v. Cameron-Brown Co.*, 72 F.R.D. 48 (M.D.N.C.1976); *Graybeal v. American Savings & Loan Ass'n*, 59 F.R.D. 7 (D.D.C.1973); *Cotchett v. Avis Rent A Car System, Inc.*, 56 F.R.D. 549 (S.D.N.Y. 1972). We have informed plaintiff's counsel that we consider the presence of a named plaintiff able to assist counsel and retain some control over the progress of the action essential if class interests are to be protected. See our order in *Ivy v. Boeing*, No. 76–64–C5 (D.Kan., 9/8/77), *citing In re Goldchip Funding*, 61 F.R.D. 592, 594–95 (M.D.Pa.1974). We do not believe a representative plaintiff should be a disposable entity while counsel continues to represent a class. The conflict of interest that may arise thereby is demonstrated by the compromise of the class and representative plaintiff's interests suggested in this case.[22]

Defendant opposes allowing Ms. Earley to represent the class through her current counsel for the further reason that the proposed settlement would have adjudicated the claims of Ms. Earley. The reply of counsel to this argument at the hearing was to the effect that since Ms. Earley received her right-to-sue letter after settlement negotiations had been abandoned, the fact the settlement proposal made no provision that she should share in the settlement proceeds is immaterial to her present attempt to intervene. We will not consider the effect of any past conflict of interest between Ms. Earley and her counsel. We note, however, that regardless of the relatively recent receipt of the right-to-sue letter by Ms. Earley, counsel obviously knew of her pending claims during the negotiations for settlement, and erroneously represented the situation to the Court.[23]

The timing of Ms. Earley's right-to-sue letter is important, however, in that her intervention or joinder as a class represent-

---

**22.** In *Graybeal, supra* in text, the court outlined the dangers inherent in allowing counsel to act:

in the dual roles of attorneys for, and representatives of, the proposed class. These dual roles are inherently fraught with potential conflicts of interests. In any class action there is always the temptation for the attorney for the class to recommend settlement on terms less favorable to his clients because a large fee is part of the bargain. The impropriety of such a position is increased where, as here, the attorney is also the representative . . .

*Id.* at 13–14. The conduct of the present case is evidence that if an involved and active class representative is not present, the only persons to gain from a class suit may be the attorneys who represent the class. See *Eisen v. Carlisle & Jacquelin*, 391 F.2d 555, 571 (2d Cir. 1968) (Lumbard, C. J., dissenting).

**23.** Ms. Earley's EEOC charge was filed March 19, 1977. It is filed on behalf of her individually "and for all others similarly situated (class action)." The "contact" is listed as "Mr. Fred W. Phelps, Attorney for Charging Party and Class." The charge is filed against "hundreds" of "company officials." The charge itself is set forth in two different typefaces; the first paragraph reads:

The employer uniformly and systematically discriminates against females as a class, including the charging party, in hiring, promotion, discharge, classification, layoffs, compensation, benefits, terms and conditions of employment. Male applicants and employees receive preferential treatment and opportunities in hiring, promotion, discharge, classification, layoffs, compensation, benefits, terms and conditions of employment.

*Compare* with the charge of plaintiff Smith set forth at note 1 *supra* and accompanying text. Ms. Earley's charge is notarized by Shirley L. Phelps. The final sentence of the charge reads: "This is a class action for all female job applicants and employees for past 2 years to settlement." Plaintiff's counsel undoubtedly were aware of this pending charge during the settlement negotiations, for plaintiff's counsel obviously filled out the charging form.

However, when the court inquired as to the existence of other claims at the November 3 hearing, the following exchange took place:

THE COURT: Now, Mr. Phelps, did you say that there are other claims filed, other claims pending with EEOC?

MR. PHELPS: No, they are not filed. I have them in my office. I showed them to—

MR. ENTZ: As I recall no other claims have been made to the EEOC, or right to sue letters have been received.

MR. PHELPS: That is true.

Earlier counsel had stated "delegations" had come to his office and had signed these other complaints.

ative would create management problems due to the applicable time limits and statutes of limitations. While we are aware that an intervenor need not possess the standing necessary to initiate the lawsuit, *Trbovich v. United Mine Workers of America*, 404 U.S. 528, 92 S.Ct. 630, 30 L.Ed.2d 686 (1972), plaintiff's counsel conceded at the hearing that there might have to be some adjustment of the class description.[24]

Further, although nothing in the documents filed on behalf of Ms. Earley so indicated, counsel stated at the December 15 hearing that the class now sought to be certified encompassed employees, former employees, and applicants for employment with defendant in Kansas only. Over a year and a half after moving for class certification, counsel would thus eliminate thousands of persons from the purported class. No comment was made as to whether these persons should be notified of their sudden abandonment.

To be sure, Ms. Earley claims an interest in the subject of this lawsuit, and her interest is not adequately represented by existing parties. Rule 24(a), Federal Rules of Civil Procedure. Yet only if this case is allowed to proceed as a class action would "disposition of the action . . . impair or impede [her] ability to protect that interest." We have already determined that class action status is completely inappropriate with Pamela Sue Smith as class representative and Fred Phelps, Chartered, as class counsel. Ms. Earley may file an individual suit at less expense, and with more dispatch, than would be the case if she attempted to resurrect the class action now before us. The class action she contemplates differs from that which has been ostensibly conducted to date. We are asked in effect to create a "subclass" which Ms. Earley would represent, leaving the balance of the original class unrepresented and forgotten. Most tellingly, class counsel is to remain the same. As was stated nearly ten years ago in a very different context, "the adequacy of representation is unaffected where the same counsel is involved." *Hicks v. Crown Zellerbach Corp.*, 49 F.R.D. 184 (E.D.La.1968).

In disallowing intervention by Ms. Earley as class representative, we work no prejudice to her purusal of her individual claim, or indeed to her right to seek to represent a proper class; we merely state that the present action is an inappropriate vehicle for maintenance of her claims. Ms. Earley may still file a lawsuit. She is not barred until February of 1978, and it may well be that her pending motion for intervention in this case will have the effect of tolling the 90-day period.

We have stated our position that this case cannot continue as a class action with the present class representative or present class counsel. This brings up the question of how this fact will be communicated to the class. Text writers have taken the position that notice requirements do not apply to involuntary dismissals of class suits, because "motions to dismiss are not susceptible to collusion between the named plaintiffs and defendants and, hence, the interests of the unnamed class will not be disregarded by their purported representatives." Wheeler, Predismissal Notice and Statutes of Limitations in Federal Class Actions, 48

---

**24.** The difference counsel admitted to be "a year or a year and a half." At the November 3 hearing the court was told that first-class mail notice would be impracticable because of the "high turnover" of defendant's employees and the fact application records were destroyed after a short time. In arguing for intervention plaintiff's counsel made no attempt to explain how the "shifting class" problem might be managed. Indeed, counsel has never dealt squarely with statute of limitations problems in Title VII cases. As we said in our order of October 20, 1977, in *Lang v. Hallmark*, No. 76–99–C5:

The time-frame in these cases [filed by plaintiff's counsel] is inevitably described as "at all times encompassed by the relevant statutes herein." While these computations are relatively simple to make, the Court is constantly burdened with ruling on these matters.

At the hearing November 3, plaintiff's counsel played down the res judicata effect of the proposed settlement "because of that relatively narrow statute of limitations—two hundred days or whatever . . ." 42 U.S.C. § 2000e–5(f) makes no reference to any 200-day period.

So.Cal.L.Rev. 771, 792 (1975); *see* 7A Wright & Miller, Federal Practice & Procedure, Civil, § 1797, at 235. However, in this case it is implicit in our holding that the purported representative and her counsel have not attended to the best interests of the absent class. Although no notice of any kind has been sent to class members, we believe in the situation before us notice may be necessary since there may have been some reliance by class members who heard of the suit and decided to forego individual action on their individual complaints. This belief is buttressed by Mr. Phelps' statement on November 3 that "delegations" of defendant's employees or applicants for employment had visited his office and signed complaints against defendant. See note 23 *supra.* Thus although the Court entered an order prohibiting communication with potential class members on January 27, 1977, it is quite likely that at least some class members learned of this case and relied upon plaintiff and counsel to vindicate their rights. We believe parties should be notified of the dismissal of plaintiff's class action allegations if it is indeed the case that they have been aware of the filing of this action.

■ We cannot today determine what the scope of this notice should be, for we cannot determine the degree of publicity which has attended this case. As we said in *Johnson v. Wentz, supra,* notice should be tailored to the requirements of the individual case:

> The courts should examine these situations on a case-by-case basis, with the probability of reliance by absent class members being the primary factor for consideration. *Magana, supra,* 74 F.R.D. at 70, citing *Berse v. Berman,* 60 F.R.D. 414 (S.D.N.Y.1973) and *Elias v. National Car Rental System, Inc.,* 59 F.R.D. 276 (D.Minn.1973). If the court will order notice to absent class members when there is a reasonable likelihood that they have actually relied upon the commenced class action, the interests of those absent class members should be adequately protected.

*Id.* at 6. While *Johnson* considered notice requirements in the context of class action settlement, we believe the same argument can be made when class status is refused more than a year and a half after the filing of a complaint containing class action allegations. "[W]here dismissal is based on a problem of inadequacy of representation which a different plaintiff might be able to correct, notice should normally be ordered to protect possible reliance." Note, Developments in the Law—Class Actions, 89 Harv.L.Rev. 1318, 1546 (1976). It may eventuate that only a small number of persons are likely to have relied on the filing of the suit, and thus that only a small number of persons need be individually notified. However, such limited direct notice should perhaps be coupled with a more general notice to those class members who are less likely to have known of the suit. *See Berse v. Berman, supra,* and *Rothman v. Gould,* 52 F.R.D. 494, 501 (S.D.N.Y.1971), for the proposition that generalized notice may suffice when a class suit is involuntarily dismissed for failure to meet the requirements of Rule 23(a). In any event, the Court will need more information if it is to decide the question of proper notice. Accordingly, counsel for both sides are hereby ordered to submit in writing within fifteen (15) days of the date of this order an account in affidavit form of the publicity, both formal and informal, attendant to this suit, especially with regard to prospective class members. Counsel should list with particularity any class members with whom there has been direct communication concerning the institution of this suit. Counsel should give a frank assessment of the likelihood and extent of reliance by absent class members, and should include a proposal of the type of notice which should be given, if any. After these documents are submitted, the Court will proceed to decide whether notice is necessary and if so, what form it should take.

■ We have postponed our discussion of defendant's motion to allow attorney's fees and costs. We note that the motion addresses itself not to the conduct of plaintiff's counsel but rather to the allegedly

frivolous and vexatious action of Pamela Sue Smith in filing this lawsuit. As we have noted above, the Court is in no position to pass upon the merits of Ms. Smith's claim since Ms. Smith is absent and unrepresented at this juncture. Although we have noted evidence tending to support defendant's view of the merits of Ms. Smith's individual claim, we have granted her one last chance to appear and demonstrate whether she has an individual claim of some substance. Accordingly, defendant's motion for attorney's fees and costs must be denied and overruled at this time.

We do not, and cannot, pass today upon the individual claims of Ms. Smith and Ms. Earley. We await further action by either complainant. Nor do we pass upon the ethical propriety of plaintiff's counsel or wish to become entangled in the inquisitional gathering of evidence such an inquiry would entail. While we find counsel an inadequate representative of the interests of absent class members, we mean today's order to have no effect upon the traditional binary litigation plaintiff's counsel brings before this Court. The Court has less responsibility to individual plaintiffs who make a voluntary choice of counsel than to absent class members who have representation thrust upon them involuntarily. We observe that plaintiff's counsel often displays a tenacity and inventiveness in direct examination, in cross-examination and in oral argument which is to be admired, and we are fully cognizant of the willingness of Fred Phelps, Chartered, to prosecute cases on behalf of the indigent and down-and-out. However, we strongly question the firm's reflex assertion that it should "act as unsolicited champions of others," *Flanigan v. American Finance System of Georgia*, 72 F.R.D. 563 (M.D.Ga.1976), in light of the problems raised herein.

Nor do we mean to establish a minimum standard for how often an attorney should confer with his client, and to what extent he should disguise his client's shortcomings. If suffices to say that no representation should be made that settlement negotia-

tions are invited, much less accepted, when the plaintiff has not been seen by counsel for over four months. Further, even had there been no questionable conduct in this case, the volume and remarkable similarity of the cases filed by plaintiff's counsel convinces us that scrupulous attention to the responsibilities of class representation is not paid by counsel. *Abeunt studia in mores, et calceus major subvertit*[25]—plaintiff's counsel have sacrificed quality for quantity in almost every phase of class representation.

Accordingly, this case will not proceed as a class action. The motions to dismiss the individual claim of Pamela Sue Smith, and to recover attorney's fees and costs pursuant thereto, are denied at this time but will be reviewed after thirty days, during which should Ms. Smith appear she should show cause why her claim should not be dismissed for lack of prosecution. The motion to intervene as class representative of Ms. Earley is denied in that it contemplates a continuation of representation by present counsel, and would materially retard the progress of this case and prejudice defendant, especially since different class parameters might have to be drawn. The attorneys will submit suggestions on the question of notice as outlined above.

IT IS SO ORDERED.

### ON REHEARING

This case comes once more before the Court for hearing on defendant's motion for attorney fees and costs, and plaintiff's counsel's motion for reconsideration of the prior order dismissing class claims, dated January 23, 1978. A hearing was held March 16, 1978, and all involved counsel were present.

We will first take up the motion for fees and costs. Since plaintiff has vanished, defendant seeks to recover fees and costs from her former counsel. Yet first the court must determine whether defendant is entitled to recover fees and costs. In *Christiansburg Garment Co. v. EEOC*, 434 U.S. 412, 98 S.Ct. 694, 54 L.Ed.2d 648 (1978),

---

**25.** "Zeal develops into habit, and a shoe too large trips the wearer."

the Supreme Court outlined the standards for granting attorney's fees to a successful Title VII defendant:

> [A] plaintiff should not be assessed his opponent's attorney's fees unless a court finds that his claim was frivolous, unreasonable, or groundless, or that the plaintiff continued to litigate it after it clearly became so.

*Id.,* 434 U.S. at 422, 98 S.Ct. at 701. Thus much of the argument at the hearing was directed to the state of affairs which counsel encountered at the time of filing the suit. We had expressed doubt as to the merits of plaintiff's individual claim in note 7, *supra,* in view of indications in defendant's personnel records that plaintiff had been tardy or absent approximately 50% of the 30 working days she had been employed, and that her termination was voluntary on the advice of her attorney. There was no apparent reason for defendant's personnel agents to misrepresent these matters in their personnel records since the action had not been instituted when the entry was made. Also, defendant's personnel agents wouldn't necessarily know of other litigation plaintiff was pursuing if plaintiff hadn't told them. Mr. Phelps now states plaintiff represented to him she had "several months of experience and seniority," and denies (as does Mr. Glenn) that he advised her to terminate her employment. This poses a unique problem, since plaintiff remains unavailable to establish whether her situation was misrepresented to counsel. Thus a determination whether plaintiff could have hoped to state a valid discrimination claim, and if not, who is responsible for filing the action, is impossible. Yet assuming, arguendo, that plaintiff affirmatively misstated her situation to Messrs. Phelps and Glenn, we may still question the

thoroughness of the investigation allegedly undertaken by Mr. Phelps, particularly since defendant's responsive pleading brought out the very points as to which Mr. Phelps now claims ignorance. However, in the absence of plaintiff we are unable to say with the requisite certainty that counsel instituted the individual suit "precipitously and with the knowledge it was groundless.

The same problem carries over into the class claims. Counsel now come forward with a list of allegedly discriminatory practices which they claim provide prima facie evidence of class discrimination. Defendant, of course, controverts the claim. Although in *Christiansburg* Justice Stewart cautioned against the overzealous application of "hindsight logic" in granting attorney fees, it is apparent that when a controverted claim is never heard on the merits, an assessment of its "reasonableness" is impossible due to the unavailability of hindsight. We are unable to say with conviction the class allegations in this suit were frivolous from the outset.

Because *Christiansburg* would appear to allow fees for an unreasonable *continuation* of litigation, the Court endeavored to discover when it became obvious that it would be unreasonable for plaintiff's counsel, in light of plaintiff's disappearance, to further litigate her claim. Messrs. Gelfond and Levin assert they did not learn of plaintiff's disappearance until late November, and at that time advised Mr. Phelps to move for intervention. Mr. Phelps stated he was confident until late October that plaintiff could be produced,[26] and did not consider her production essential until defendant's counsel, by letter of October 24, signified an intent to proceed with the deposition October 27 regardless of the outcome of settlement negotiations.[27] The evidence as to

---

**26.** Mr. Glenn stated he told Mr. Phelps in July plaintiff could not be found. Mr. Phelps explained that his office mailed notices of depositions to plaintiff and they were not returned, so he had no reason to believe she could not be produced. No explanation was given as to how the last-minute cancellations were handled by mail. At the same time, Mr. Glenn had a private investigator looking for plaintiff. Mr. Phelps, in late October, retained a second investigator who, it is now asserted, once again led counsel to believe plaintiff could be located shortly. Cf. note 20, *supra.*

**27.** We note that even assuming Mr. Phelps can thus explain his asserted ignorance of plaintiff's disappearance, it is thereby shown that plaintiff's participation was not considered essential to settlement negotiations.

who knew what, and what time, is confusing and conflicting. We have no question that this action was improperly handled in several respects, but have no desire to set forth standards concerning what constitutes an "unreasonable" lack of contact with a client,[28] for purposes of assessing fees against counsel. For this reason, defendant's motion for fees will be denied.

The motion for reconsideration appears to have been filed primarily for the benefit of Messrs. Levin and Gelfond, who object to certain statements regarding "plaintiff's counsel" in our prior order. Levin and Gelfond wish it to be understood that their role was limited to that of advisors on class action legal issues, and although they participated directly in certain aspects of the case upon request from Mr. Phelps, they had no contact with or knowledge of plaintiff, her individual claim, or her disappearance. They contend their entry of appearance was "inartfully framed" and should have reflected their advisory status. They have submitted affidavits from six highly respected Pennsylvania attorneys attesting to their competence and ethical propriety.

References to "plaintiff's counsel" in our prior order were inclusive of necessity, for the court does not police the respective roles of co-counsel in a case absent indications, such as have now surfaced, that such policing is necessary. We have no reason to doubt Philadelphia counsel's version of the relative responsibilities of themselves and Fred Phelps, Chartered, with regard to the conduct of the suit; yet as they implicitly admit, it was impossible for the Court to sort out these respective roles when all pleadings indicated coequal status of all counsel.

It appears Levin and Gelfond are particularly pained by their implicit inclusion in

the court's condemnation of the settlement proposal. Both stated they had nothing to do with formulation of the settlement and, with regard to the $15,000, advised only that attorney fees could not be discussed prior to approval of any settlement. Mr. Phelps said he assumed the $15,000 mentioned at the November 3 hearing was a product of Mr. Levin's negotiations with defendant's counsel.[29] At the very least there was such a lack of coordination among Philadelphia counsel and Kansas counsel that defendant was able to draw up a settlement and present it to the court, with the apparent approval of plaintiff's representative, having never negotiated the terms of the proposal with anyone representing an adverse interest. While the affirmative acts taken by Gelfond and Levin with regard to the settlement may have been blameless [and we did attempt to make their "advisory" status clear in our prior order], the fact remains that all outward appearances at the time of our prior order pointed to a shared responsibility. The court must assume that counsel who enter appearances of record take pains to keep abreast of the case. We do not believe our blanket references to "plaintiff's counsel" in the January 23 order can be fairly construed to derogate the ability of either Mr. Levin or Mr. Gelfond to prosecute with perspicacity any class action case in which they are direct participants.

We do, however, take exception to the defense of "form pleadings" commencing at page 10 of counsel's post-hearing brief. Gelfond and Levin assert the court "was not aware of certain facts showing [they] did give the liability aspects of the case highly intensive and individualized attention." We observe that it was impossible for the court to be aware of anything other than the fact the plaintiff filed a lawsuit

---

28. We note in passing that a suit filed on Ms. Smith's behalf by Mr. Phelps in January of 1976 remains active in state court although Mr. Phelps has not been in contact with Ms. Smith for nearly a year.

29. At the March 16 hearing Mr. Phelps stated he had not known of the $15,000 figure and was surprised when Mr. Entz announced it at

the November 3 hearing. Mr. Entz letter of October 24 specifically mentions this figure, and as note 6 *supra* demonstrates, Mr. Phelps, Jr. spoke knowingly of the "$15,000 attorney fee settlement" on October 27. Mr. Meredith, a representative of defendant, testified that he understood the $15,000 was going "strictly to the attorneys as a ripoff or payoff."

alleging employment discrimination. While it is true, as counsel point out, that the Federal Rules of Civil Procedure sanction the use of very simple form pleadings and motions, see Rule 84, a glance at the Appendix of Forms will demonstrate that every form therein contemplates the allegation of the facts upon which the suit is based. In *Peak v. Topeka Housing Authority,* 78 F.R.D. 78 (D.Kan. 1978), the court undertook an analysis of a complaint functionally identical to that filed in this case, and concluded it failed to meet even the minimal notice pleading requirements of Rule 8. While we must in fairness note that Messrs. Gelfond and Levin do not appear as co-counsel in *Peak* or in *all* the other purported class actions listed in note 11, *supra*, in every case in which they do appear the complaint as filed is the equivalent of that filed by Mr. Phelps in *Peak*, and we believe each is similarly defective.

Further, in each form in the Appendix to the Federal Rules which does not contemplate the allegation of specific facts there is reference to an attached contract or agreement which gives rise to the alleged obligation. Similarly, in each Title VII complaint filed by plaintiff's counsel (here inclusive) in this court there is referred to, and appended, a copy of the charge of discrimination filed with the EEOC. One might logically refer to this document for particulars of plaintiff's grievance, but this would prove unavailing. In each Title VII case filed by counsel the charge submitted to the EEOC recites the same litany of alleged abuses as set forth in notes 1 and 23, *supra*. Thus not only is the court in these cases kept ignorant of the nature of the individual claim, the EEOC must also proceed in the dark.

The administrative prerequisites to a Title VII action were not designed solely to delay the filing of an action. The EEOC conciliation process can be a quite effective tool for resolving employment disputes, if only the agency is informed of the nature of the particular problem. When the EEOC is faced with the sort of charges Mr. Phelps prepares, its investigation cannot have any focus, and the "charge" cannot be resolved without an intensive investigation of every phase of an employer's personnel practices. When the agency is faced with a miasma of such charges, it is little wonder its conciliation process proves ineffective.[30]

A further policy argument for pleading something resembling factual allegations in both the EEOC charge and the complaint is that filing of any legal charge may have a coercive effect upon a guilty defendant. Some discriminatory practices might be corrected voluntarily by the employer once they are pointed out, and backed up by the threat of investigation and suit. The possibility of an immediate and voluntary resolution of such matters is certainly preferable to a protracted struggle over them, particularly for the sake of class members who may benefit immediately.

Counsel next defend the use of "stock" interrogatories, and announce that the questions propounded in this case were designed by the EEOC for use in employment discrimination cases. While we are certain many attorneys refer to forms in conducting initial discovery, we would point out that the form should be abandoned and ignored when clearly inappropriate to the case as filed. See note 2 *supra* and accompanying text.

Finally, counsel defend the filing of stock class motions and briefs on tactical grounds, and state that the defendant should first be forced to voice his objections to class treatment in a responsive brief. Plaintiff can then meet these objections in a reply brief which responds with plaintiff's view of the facts of the case. In this fashion plaintiff does not "educate defense counsel as to possible arguments against the class ac-

---

**30.** Counsel's memorandum in opposition to defendant's motion for attorney fees refers to Mr. Phelps' feeling "justified in advising his client to initiate legal proceedings against the defendant by seeking a right-to-sue letter . . . ."

tion."[31] We are inclined to disapprove this sort of tactical one-upsmanship which can only serve to delay the progress of the action (the adequacy of plaintiff's representation is thus dependent upon the *in* adequacy of defense counsel). The more serious problem, however, is that no reply brief, indeed, no brief of any sort giving particularized attention to the parameters of the class or the facts upon which class allegations are based has ever been filed by plaintiff's counsel in any of the Title VII cases brought in this court. This is not a case of failure to file a *timely* motion, as in the case cited in counsel's post-hearing brief. Rather it is an incident, one of many, of failure to file any individually-tailored document whatsoever. Two years after the date counsel filed six class actions simultaneously, their filings in all six actions remain indistinguishable. Defendants spend huge sums complying with discovery requests, but must engage in shadow-boxing in formulating a defense to broad allegations which may, or may not, have some basis in fact. Certainly, the fact that every complaint and motion lists the same all-inclusive catalog of wrongs "cheapens the currency" and calls into question the sincerity of the allegations. Even the "facts" now presented for the first time, which Mr. Phelps claims to have gathered since June of 1975, would not support judicial investigation of *all* personnel practices listed in the charge, complaint, and motion; and certainly plaintiff could not have shared in all these grievances, although it is so pleaded in the complaint. We continue to believe that, in the circumstances here presented, the filing of form pleadings evidences an inability to represent the interests of an absent class.

■ Two matters remain to be concluded in this action: dismissal of the named plaintiff's claim, and notice of dismissal of the class allegations. Plaintiff's whereabouts remain unknown. She is unrepresented, and her former counsel accuses her of misrepresenting the facts of her aborted employment. She cannot be reached at her last known address, and retains no apparent interest in the litigation she has initiated. Her claim will be, and is hereby, dismissed for want of prosecution.

In our January 23 order, we directed counsel for both sides to submit in writing, by February 7, certain information for use in determining the notice to be given potential class members of dismissal of the class claims. Defendant responded; plaintiff's counsel did not and have not. An affidavit submitted by Mr. Phelps indicates he talked to four named former employees of defendant regarding this suit; clearly notice should be given them if they are potential members of the class sought to be certified in this case. Mr. Phelps will notify these persons informally,[32] and will forward to the court a written evaluation of the necessity for broader notice as requested in the January 23 order.

To recapitulate, defendant's motion for attorney fees is denied. Plaintiff's counsel's motion for reconsideration does not call for a ruling, except to the extent we refuse to vacate our prior order; however, we hope the discussion above serves to clarify the role of Philadelphia counsel as de-

---

We believe this is indicative of counsel's apparent contempt for EEOC conciliation.

**31.** Philadelphia counsel state Mr. Levin advised Mr. Phelps to "pursue these tactics and supplied him with a generalized opening brief." Post-hearing brief of Gelfond and Levin, p. 14. The brief, as we noted in note 11 *supra*, is a variant of one apparently formulated by counsel having nothing to do with this case. No reply brief was filed; it is unclear whose responsibility formulation of such a brief was to be, although it certainly is implied that Mr. Phelps was to do this. It appears, then, that Philadelphia counsel saw their role in pro-

moting class certification as rudimentary at best, for they were never called upon to formulate any original documents concerning the propriety of class treatment for use in the case.

**32.** We do not feel it is necessary to formulate and approve formal notice to these persons. At least two are plaintiffs in other Title VII actions filed by Mr. Phelps, and we presume they are in contact with Mr. Phelps' office for this reason. Should it eventuate that broad notice needs to be given, counsel will be requested to submit proposed forms of notice for court approval.

sired. The claim of Pamela Sue Smith is dismissed.

IT IS SO ORDERED.

Dated this 11th day of April, 1978.